30 November 1999

No.  3--98--0465

_________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 1999

RICHARD KOPCZICK, )  Appeal from the Circuit Court

)  of the 13th Judicial Circuit,

Plaintiff-Appellee, )  Grundy County, Illinois,

)

)  No.  94--L--30

)

HOBART CORPORATION, )  Honorable

)  Robert C. Marsaglia

Defendant-Appellant. )  Judge, Presiding.

_________________________________________________________________

JUSTICE SLATER delivered the opinion of the court:

_________________________________________________________________

Plaintiff, Richard Kopczick, filed a complaint seeking damages from defendant, Hobart Corporation, for injuries he sustained while using a meat saw manufactured by defendant.  Following a jury trial, the trial court entered judgment against defendant for $20 million in punitive damages and $553,644.74 in compensatory damages.  On appeal, defendant contends, 
inter
 
alia
, that the trial court erred: (1) by denying defendant’s motion for judgment notwithstanding the verdict concerning the punitive damages award; (2) by denying defendant’s motion for a new trial due to the misconduct of plaintiff’s counsel; and (3) by granting plaintiff an excessive compensatory damages award.  For the reasons that follow, we reverse the punitive damages award, but affirm the trial court’s judgment in all other respects.

Initially, we note that defendant raises claims of error with respect to punitive damages other than the claim previously stated.  Because we agree with defendant that the evidence is insufficient to warrant imposition of punitive damages, we need not address these other claims.  Moreover, because defendant does not challenge the sufficiency of the evidence supporting an award of compensatory damages, we recount and scrutinize only those portions of the trial court proceedings relevant to the imposition of punitive damages, the episodes of alleged misconduct by plaintiff’s counsel, and the amount of compensatory damages.

FACTS

The “vertical” or “straight” meat saw (the straight saw) is a motorized bandsaw with its blade set perpendicular to the saw’s cutting surface.  This design is, and has always been, the conventional design for a meat saw.  Defendant is a leading manufacturer of commercial food-processing equipment, including meat saws.  In 1979, defendant began developing a meat saw with its blade set at a 75-degree angle to the cutting surface.  Defendant’s engineers theorized that this 15-degree difference would reduce operator fatigue by introducing a horizontal force assisting operators to push meat through the saw.  This design became known as the “horizontal” or “slant” saw (the slant saw).  In January 1982, Underwriters Laboratories (UL) gave its approval to the slant saw.  In its report, UL specifically found that the slant saw’s horizontal force does not cause the saw to self-feed.  In July 1982, defendant introduced the new design to the marketplace as its Model 5700.  From 1982 through 1992, defendant sold 5,816 Model 5700s.  During this period, it is a conservative estimate that meatcutters employed the Model 5700 to make 4,540,080,000 cuts of meat.  Defendant continues to market the Model 5700.

D & S Foods (D & S) purchased a Model 5700 in 1983.  Plaintiff is a journeyman meatcutter and the meat-market manager for D & S.  On the morning of May 22, 1993, plaintiff severed his left index finger and lacerated his left middle finger while operating the Model 5700 owned by D & S.  Plaintiff filed a complaint seeking recovery from defendant for his injuries.  Ultimately, as amended, the complaint consists of one count of negligence and one count of willful and wanton conduct.  Common to both counts is the allegation that the design of the Model 5700 presents the user with an unreasonably dangerous condition, namely: the tendency of the Model 5700's angled blade to jerk, pull, and roll meat into the blade causing the operator to sustain injury when his hands are drawn into the blade along with the meat.
(footnote: 1)  In count I, plaintiff alleges that defendant’s manufacture and sale of the Model 5700 was merely negligent.  In count II, plaintiff alleges that defendant’s conduct constitutes a willful and wanton disregard for, and indifference to, his safety, entitling him to punitive damages.

At trial, plaintiff called nine meatcutters to the stand.  Each meatcutter testified that he had observed the Model 5700 self-feed occasionally.  Four of the meatcutters testified to sustaining injuries as a result of the Model 5700's tendency to self-feed.  Each of the injured meatcutters testified he had sued defendant for damages resulting from his injury.  One of the meatcutters, David Fuller, testified that Jim Potts, a regional sales manager for defendant, was present at Fuller’s workplace when a Model 5700 shot a ham shank against a wall.  Fuller estimated that this incident occurred sometime prior to 1985.  The parties later stipulated to the following facts:  that Potts acknowledged that he observed the incident described by Fuller during a January 1992 deposition; that defendant received notice of this testimony prior to plaintiff’s injury; and that Potts never reported the incident to anyone employed by defendant.

Plaintiff presented documents showing that, prior to plaintiff’s injury, defendant had received notice of 30 incidents in which meatcutters had claimed to have been injured as a result of the Model 5700's tendency to self-feed.  These 30 incidents include the claims of the four injured meatcutters who testified at trial.

Donald Cetro testified that he is the business agent for a New Jersey union local which represents, among others, meatcutters.  Previously, Cetro had been an assistant to Anthony Testa, then the director of safety for the union local.  In 1984, Testa and he sent a letter (the Testa Letter) to defendant.  The following is the pertinent text of the letter:

“[Y]ou now manufacture a slant saw that many butchers find to be very dangerous.  Butchers have severed fingers on this saw. ***

Many butchers with as many as 30 [to] 40 years of service are very fearful of this slant saw.  I’m sure that if you send a Hobart representative into the [workplace] and he spoke to the people about the slant saw, that you *** would probably call back these machines, as many car dealers call back cars that are unsafe.”

Plaintiff presented six documents detailing the results of tests conducted by defendant.  The first such document is a report, dated November 1981, which describes the results of tests comparing the cutting characteristics of the Model 5700 and the Model 5701, a straight saw manufactured by defendant.  Among other observations, the author of the report notes that the Model 5700 produced “a few wedge cuts[,]
(footnote: 2) but this is characteristic when trying to force or jam [the meat] through [the blade].”  The author also observed that “[a] couple of times the wedge cut pulled the blade over into the meat so [that,] when it exited[,] the blade hit the carriage back pusher.”  In response to this report, defendant made modifications to the Model 5700 intended to stabilize the saw’s blade.  These modifications were incorporated into the Model 5700 purchased by D & S in 1983.

The second report, dated December 1982, indicates the cutting performance of the Model 5700 improves when a four-tooth blade is substituted for a three-tooth blade.  The third report, dated July 5, 1983, describes the results of tests comparing the cutting performance of the Model 5700 with the Model 5701 and the Model 5216, an older model straight saw manufactured by defendant.  The fourth report, dated July 13, 1983, describes the results of tests comparing the cutting performance of the Model 5700, Model 5701, and Model 5216 when fitted with three-tooth, four-tooth, and eight-tooth blades.  The remaining two reports describe the results of tests aimed at assessing the Model 5700's performance when fitted with different motors and its ability to cut various cheese products.

Charles Benedict, plaintiff’s expert witness, opined that defendant must have known that the Model 5700 was an unreasonably dangerous product prior to plaintiff’s 1993 injury.  Benedict testified that the results of defendant’s own 1981 tests should have put defendant on notice of the Model 5700's self-feeding defect.  According to Benedict, “any competent engineer” would have been put on notice of the self-feeding defect by test results showing that the saw occasionally produced wedge cuts due to bowing of the saw’s blade.

Benedict also found evidence of defendant’s pre-injury knowledge of the Model 5700's self-feeding defect in a provision of the Model 5700's instruction manual which advises operators to use a four-tooth blade, rather than a three-tooth blade, when cutting specified types of meat.  Benedict testified that the fewer the number of teeth, the greater the tendency for the blade to self-feed.  Therefore, in Benedict’s opinion, instructing operators to use a four-tooth blade, rather than a three-tooth blade, was an effort to remedy or ameliorate the Model 5700's self-feeding defect.

Benedict also testified that he considered a warning label affixed to the Model 5700 and a warning included in the saw’s instruction manual to be further evidence of defendant’s pre-

injury knowledge of defect.  The label affixed to the Model 5700 includes the phrase “slant blade requires less feed effort” among the hazards listed under the caption “WARNING.”  In the Model 5700's instruction manual, defendant cautions the reader in the following manner: “WARNING: MACHINES WITH THE INCLINED BLADE PATH REQUIRE LESS FEED EFFORT.”  According to Benedict, these admonitions constitute defendant’s tacit acknowledgment of the self-feeding defect.

In addition, Benedict stated his opinion that defendant violated the “Hierarchy of Design Responsibilities” (HODR), an industry wide ethical standard which defendant had adopted as company policy.  The HODR requires a manufacturer to eliminate safety hazards by design whenever possible before resorting to safety guards and warnings.  According to Benedict, defendant could have eliminated the hazard posed by the Model 5700's self-

feeding defect by simply reverting to a straight saw design.

Benedict also testified that defendant’s July 13, 1983, test results show that the Model 5700 does not enjoy any performance or efficiency advantage over the Model 5701.  Furthermore, according to Benedict, the fact that the Model 5700 lacks any advantage over the Model 5701 reveals the falsity of defendant’s advertising claims that the Model 5700 reduces operator fatigue. 

Dan Weber, a former employee of defendant, testified that defendant’s “records retention schedule” provides that documents falling under the rubric “PROJECTS -- ORIGINAL DOCUMENTATION” should be retained by the engineering department for 15 years.  Weber also testified that it was defendant’s policy that there be written reports of “field tests,” 
i.e.
, tests whereby a representative of defendant would elicit feedback concerning a new product from selected operators.  Weber testified that field test reports generally consisted of one or two lines summarizing the operators’ comments concerning the new product.  Weber also testified that the policy of reducing field test findings to writing was not “heavily enforced.”

Evidence of record also showed that defendant currently charges approximately $500 more for the Model 5700 than the Model 5801, its latest model straight saw.  In addition, there was evidence that defendant produces “far more” Model 5801s than Model 5700s, resulting in a higher per-unit cost of production for the Model 5700.

ANALYSIS

I.

On appeal, defendant contends
 that the trial court erred by denying its motion for judgment notwithstanding the verdict concerning the award of punitive damages.

A motion for judgment notwithstanding the verdict (JNOV) should be granted when, viewing all the evidence in the light most favorable to the nonmovant, the evidence so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand.  
Pedrick v. Peoria & Eastern R.R. Co.
, 37 Ill. 2d 494, 229 N.E.2d 504 (1967).  A trial court should only grant a motion for JNOV where there is no evidence demonstrating a substantial factual dispute or where the assessment of the credibility of witnesses or the determination of conflicting evidence is not decisive to the outcome.  
Maple v. Gustafson
, 151 Ill. 2d 445, 603 N.E.2d 508 (1992).  In recognition that trial courts are not to weigh evidence, resolve conflicts in evidence, or assess the credibility of witnesses, a ruling on a motion for JNOV is subject to 
de
 
novo
 review.  
Bally v. Pora
, 303 Ill. App. 3d 239, 706 N.E.2d 1038 (1999).

Punitive damages may be awarded when torts are committed with fraud, actual malice, deliberate violence, or oppression, or when the defendant acts willfully or with such gross negligence as to indicate a wanton disregard of the rights of others.  
Kelsay v. Motorola, Inc.
, 74 Ill. 2d 172, 384 N.E.2d 353 (1978).  In the context of a products liability claim, a manufacturer’s awareness that its product is unreasonably dangerous coupled with a failure to act to reduce the risk amounts to willful and wanton conduct.  
Bass v. Cincinnati, Inc.
, 180 Ill. App. 3d 1076, 536 N.E.2d 831 (1989).  However, ordinary negligence is not wantonness.
 
Loitz v. Remington Arms Co.
, 138 Ill. 2d 404, 563 N.E.2d 397 (1990).  Instead, in order to support a punitive damage award for willful and wanton conduct, the plaintiff must establish knowledge of the unreasonably dangerous condition, knowledge or notice that this condition is likely to cause injury, and failure to warn or remedy the condition or take some other affirmative action to prevent the injury.  
Davis v. International Harvester Co.
, 167 Ill. App. 3d 814, 521 N.E.2d 1282 (1988).

For evidence of defendant’s pre-injury knowledge of defect, plaintiff relies on defendant’s pre-injury notice of 30 incidents in which meatcutters claimed to have suffered injuries as a result of the Model 5700's self-feeding defect.  Evidence that defendant had notice of prior accidents substantially similar to that alleged by the plaintiff is a relevant consideration to determining the propriety of punitive damages.  
Bass
, 180 Ill. App. 3d 1076, 536 N.E.2d 831.  Nevertheless, the notice of prior accidents in this case does not approach the magnitude and character necessary to conclude that defendant was unable to maintain a good faith belief in the safety of its product.

In 
Loitz v. Remington Arms Co.
, 138 Ill. 2d 404, 563 N.E.2d 397 (1990), our supreme court discussed the probative value of notice to a defendant of prior substantially similar occurrences (SSOs) for purposes of assessing the propriety of an award of punitive damages.  The court considered the following factors important to this determination: (1) the ratio of prior SSOs to the total number of products sold and the number of products in use; (2) the ratio of SSOs to the frequency of the product’s use; and (3) the particular product’s inherent dangers.  
Loitz
, 138 Ill. 2d 404, 563 N.E.2d 397.  In reversing an award of punitive damages, the court applied the foregoing factors to conclude that notice of 94 gun-barrel explosions substantially similar to the explosion causing the plaintiff injury was not sufficient to put the defendant manufacturer on notice of the defect alleged by the plaintiff.  
Loitz
, 138 Ill. 2d 404, 563 N.E.2d 397.

In the case 
sub
 
judice
, uncontradicted evidence established that defendant sold 5,816 Model 5700 saws from 1982 through 1992, the last calendar year before plaintiff’s injury.  During this same 11-year period, it is a conservative estimate that meatcutters employed the Model 5700 to make approximately 4,540,080,000 cuts of meat.  Application of this data to the 
Loitz
 factors shows that 30 SSOs represents roughly 0.5% of the total production of the Model 5700 and 0.0000007% of the estimated total number of cuts made with the Model 5700.  Such meager percentages do not put a manufacturer of a mass-produced and inherently dangerous product on notice that its product has an unreasonably dangerous defect.  This is particularly so when, as in this case, the claimed injuries arise from a risk that inheres in the product’s intended use.  Unlike 
Loitz
, where the danger of an exploding gun barrel was not a risk inextricably linked to the use of shotguns, the risk in this case, the severing of the saw operator’s fingers, is a danger associated with any meat saw, regardless of its design.

Plaintiff also claims that the Testa Letter put defendant on notice that the Model 5700 was unreasonably dangerous.  The letter informs defendant that the safety director of a union local considers the Model 5700 “very dangerous” based on complaints of the local’s members and an undisclosed number of incidents in which butchers had severed fingers while operating the saw.  The letter does not include a reference to any self-

feeding phenomenon or snatching, jerking, or pulling of meat through the saw’s blade.  In light of the fact that all meat saws are inherently dangerous instrumentalities, notice that operators had been injured for unspecified reasons while using the Model 5700 cannot be considered notice of the specific defect alleged in the case at bar.

In addition, plaintiff proffers the opinion of his expert witness, Charles Benedict, that a number of circumstances show defendant must have been aware of the Model 5700's self-feeding defect prior to plaintiff’s injury.  Benedict opined that defendant’s 1981 test results should have put defendant on notice of the defect alleged by plaintiff.  However, even assuming that Benedict’s interpretation of the 1981 test results is correct, it is evident that the test results could not have put defendant on notice that the saw operated by plaintiff was defective.  The opinion is based upon tests conducted in 1981.  In response to these tests, defendant modified the Model 5700 to remedy the “wedge cut” problem.  The Model 5700 purchased by D & S Foods in 1983 is a modified Model 5700.  Accordingly, the 1981 test results could not have put defendant on notice that the Model 5700, modified in response to the 1981 tests, is defective in the manner alleged by plaintiff.

Benedict also found evidence of defendant’s pre-injury knowledge in a provision of the Model 5700's instruction manual which advises operators to use a four-tooth blade, rather than a three-tooth blade, when cutting specified types of meat.  Defendant increased the number of teeth on the blade of its slant saw and one of its straight saws after 1983 test results showed that use of a four-tooth blade would improve the cutting performance of the Model 5700.  Nevertheless, in Benedict’s opinion, improving the performance of the saw was, apparently, a pretextual or secondary rationale for advising operators to use a four-tooth blade.  The overriding concern prompting the modification was the self-feeding defect.

In viewing the evidence in the light most favorable to plaintiff, we must assume Benedict is correct in his claim that the number of teeth in a saw’s blade is inversely proportional to its tendency to self-feed.  However, we need not accept his conjecture concerning what motivated defendant to instruct operators to use a four-tooth blade.  Defendant’s testing focused on the performance and efficiency of defendant’s meat saws when fitted with various blades, not safety concerns.  Moreover, the tests did not show that the Model 5700 has a tendency to self-

feed.  Rather, the tests showed that increasing the number of teeth would improve the saw’s cutting performance.  As a result, Benedict’s opinion that defendant increased the number of teeth in the Model 5700's blade to remedy the self-feeding defect is not supported by evidence in the record.

Plaintiff also notes Benedict’s testimony that the warning affixed to the Model 5700 and the warning included in the saw’s instruction manual amount to an acknowledgment that the Model 5700 has a propensity to self-feed.  Assuming it is correct that defendant employed the word “warning” in order to draw the user’s attention to a hazard, it does not follow that the hazard posed by the saw’s horizontal, assisting force is synonymous with the self-feeding defect at issue in the case at bar.  The warning that the Model 5700 requires “less feed effort”only becomes a sinister euphemism for the alleged self-feeding defect if one assumes defendant was aware of the defect.  Therefore, the warnings have little, if any, probative value with respect to defendant’s knowledge of the self-feeding defect.

Plaintiff also directs our attention to Benedict’s opinion that defendant violated its own HODR policy.  In order for defendant to have violated the HODR, defendant would have had to place the Model 5700 in the stream of commerce knowing that the saw tends to self-feed and that this tendency could be eliminated by design.  Thus, Benedict’s opinion that defendant violated the HODR is premised on his opinion that defendant knew the Model 5700 to be defective.  Accordingly, Benedict’s opinion that defendant violated the HODR is not probative of defendant’s pre-

injury knowledge of defect.

In addition, plaintiff offers Benedict’s opinion that the results of defendant’s 1983 tests demonstrate no difference in performance or efficiency between the Model 5700 and its straight-saw counterpart, the Model 5701.  Plaintiff asserts that defendant elected to sell the Model 5700 despite its knowledge that the saw is no more efficient than the Model 5701 and that it was dangerously defective.  At most, this evidence shows that defendant continued to sell a product that did not live up to its sales pitch.  Defendant’s purported advertising gimmickry does not indicate defendant’s awareness that the Model 5700 was in anyway defective, to say nothing of the specific defect alleged by plaintiff.

Plaintiff also contends that the jury was free to infer from defendant’s violation of its own document retention policy that missing test reports indicate that the Model 5700 is unreasonably dangerous.  According to plaintiff, the jury could have chosen to believe the testimony of Dan Weber, the former Hobart employee,  that defendant’s document retention policy requires that all test results be retained for 15 years and that defendant, nevertheless, failed to retain results of field tests conducted during the 15 years preceding the onset of discovery in this case.

Plaintiff mischaracterizes Weber’s testimony.  Weber testified that the document retention schedule requires defendant’s engineering department to retain for 15 years documents within the category “PROJECTS -- ORIGINAL DOCUMENTATION.”  Weber never testified as to what type of documents fall within the category “PROJECTS -- ORIGINAL DOCUMENTATION.”  Likewise, Weber never testified that it was defendant’s policy to retain field test reports.  In addition, Weber testified that defendant did not scrupulously enforce its policy requiring written reports of field tests.

The inference that defendant destroyed or failed to produce adverse test results is dependent upon the jury drawing the following inferences from Weber’s testimony:  that defendant should have required field test reports to be written; that the reports should have been retained; and that defendant lacks a reasonable explanation for failing to retain or produce the reports.  Perhaps in recognition of the speculative nature of these inferences, plaintiff withdrew its instruction No. 10 (Illinois Pattern Jury Instructions, Civil, No. 5.01 (3d ed. 1995)) which would have instructed the jury that a party’s failure to produce evidence within its exclusive control, and without reasonable explanation, gives rise to a presumption that such evidence is adverse to that party.  At any rate, regardless of plaintiff’s reasons for withdrawing the instruction, it is evident that the inference that defendant destroyed or failed to produce adverse test results is not supported by the evidence adduced at trial.

Plaintiff also asserts that the jury could have inferred that defendant charges more for the Model 5700 than its latest model straight saw, the Model 5801, in an effort to discourage sales of the Model 5700 and, thereby, limit its liability arising from the Model 5700's self-feeding defect.  Plaintiff never established that defendant’s present price structure existed prior to the date of plaintiff’s injury.  In addition, the inference that the present price structure exists to discourage sales of the Model 5700 is little more than speculation, in view of the fact that Model 5700 has a higher per-unit cost of production.

Finally, plaintiff points to various alleged acts of “reprehensible misconduct and bad faith” committed by defendant during the discovery process and during trial as further evidence supporting the jury’s award of punitive damages.  Plaintiff complains that defendant presented misleading arguments to the trial court concerning the admissibility of evidence relevant to defendant’s knowledge or notice of defect, failed to produce a number of documents and videotapes in a timely manner, failed to provide complete disclosure of its financial status until the trial had nearly concluded, manufactured evidence, and presented a variety of “false” evidence.  Such purported misdeeds, however, are not proper grist for an award of punitive damages.  Punitive damages must derive from the wrongful conduct giving rise to a cause of action.  
Duignan v. Lincoln Towers Insurance Agency, Inc.
, 282 Ill. App. 3d 262, 667 N.E.2d 608 (1996).  Such damages are not to be awarded as a sanction for a party’s misconduct during litigation.  
Duignan
, 282 Ill. App. 3d 262, 667 N.E.2d 608.  Rather, the remedy for such wrongdoing may be found in the trial court’s contempt power and rules of court, such as Supreme Court Rule 137 (155 Ill. 2d R. 137) and Supreme Court Rule 219 (166 Ill. 2d R. 219).

After a thorough review of the record, we hold that the scant evidence of defendant’s pre-injury knowledge of defect, and whatever highly speculative inferences the jury might have drawn from such evidence, were insufficient to have put the question of punitive damages to the jury.  Accordingly, the trial court should have granted defendant’s motion for JNOV concerning the claim of willful and wanton conduct.  We therefore reverse the award of punitive damages based on this claim.

[Nonpublishable material removed under Supreme Court Rule 23].

III.

Finally, defendant maintains it is entitled to a remittitur or new trial because the compensatory damages awarded to plaintiff are excessive and a result of bias, passion, and prejudice.  We disagree.

The test to determine whether a verdict awarding compensatory damages is excessive is whether the amount of the verdict falls within the necessarily flexible limits of fair and reasonable compensation or is so large as to shock the judicial conscience.  
King v. American Food Equipment Co.
, 160 Ill. App. 3d 898, 513 N.E.2d 958 (1987).  The propriety of an award of damages for personal injuries is not subject to mathematical computation, nor may it be measured by comparison with verdicts in other cases.  
King
, 160 Ill. App. 3d 898, 513 N.E.2d 958.  Rather, each verdict for a personal injury must be examined in the light of the particular injury involved, with humble deference to the discretion of the jury and the judgment of the trial court.  
King
, 160 Ill. App. 3d 898, 513 N.E.2d 958.

The jury’s award of $553,644.74 in compensatory damages is supported by substantial evidence in the record.  Plaintiff proved that he incurred $28,644.74 in medical costs and lost wages as a result of his injury.  The jury heard evidence that plaintiff suffered a traumatic injury resulting in permanent disability and disfigurement.  Evidence of record demonstrated that plaintiff’s permanent disability amounted to 20% permanent impairment to his left hand.  Plaintiff testified that the injury has resulted in continuing pain and sensitivity in his partially amputated finger.  The jury itemized the components of its compensatory award in the following manner: medical expenses, $15,429.15; lost wages, $13,215.59; disability, $75,000.00; disfigurement, $50,000.00; pain and suffering to date, $150,000.00; and future pain and suffering, $250,000.00.  These sums do not shock the conscience of this court.  Accordingly, we affirm the amount of the jury’s compensatory damages award.

For the foregoing reasons, that part of the judgment of the circuit court of Grundy County awarding plaintiff punitive damages is reversed, however that part of the judgment awarding plaintiff compensatory damages is affirmed.

Affirmed in part; reversed in part.

BRESLIN and LYTTON, J.J., concur.

FOOTNOTES
1:
Elsewhere, plaintiff refers to this phenomenon as “self-

feeding.”  To promote clarity, for the remainder of this opinion, we describe the defect alleged by plaintiff as the “self-feeding defect.”

2:
A “wedge cut” is produced when a piece of meat is cut into smaller cuts of uneven thickness.  Sellers and consumers of meat generally consider this quality undesirable due to the resulting preparation difficulties.