HARRY A. KINZINGER, JR., Plaintiff-Appellee, v. ROBERT A. TULL, Defendant-Appellant.

Fourth District   No. 4—01—0101

Opinion filed May 17, 2002.—Rehearing denied June 12, 2002.

STEIGMANN, J., dissenting.

William P. Hardy (argued), of Hinshaw & Culbertson, of Springfield, for appellant.

Edward H. Rawles (argued), of Rawles, O'Byrne, Stanko & Kepley, P.C., of Champaign, for appellee.

JUSTICE TURNER delivered the opinion of the court:

In September 1998, plaintiff, Harry A. Kinzinger, Jr., filed suit against defendant, Robert A. Tull, alleging defendant negligently operated his vehicle causing an automobile accident that resulted in injuries to plaintiff. After defendant confessed liability, the trial court held a September 2000 jury trial on the sole issue of damages, and the jury awarded plaintiff $900,000.

Defendant appeals, asserting (1) plaintiff's counsel made improper comments during *voir dire* and opening statements implying defendant's admission of liability restricted plaintiff from presenting certain evidence to the jury, (2) plaintiff's counsel in his closing argument improperly commented on defendant's failure to call opinion witnesses, (3) the trial court erred by allowing plaintiff to testify regarding an injury that was not causally connected to the accident, and (4) the damages award was excessive and unsupported by the evidence. We affirm as modified.

# I. BACKGROUND

On November 2, 1996, plaintiff was driving his pickup with his wife, Susie Kinzinger, when defendant in his pickup struck the back of plaintiff's pickup. At the time of the accident, defendant was going about 70 miles per hour and still accelerating, while plaintiff's speed was between 30 and 35 miles per hour.

In September 1998, plaintiff filed a complaint against defendant, and in September 2000, defendant admitted liability.

At the September 2000 trial on the issue of damages, plaintiff and his wife testified, and the evidence depositions of four witnesses who provided health-care treatment to plaintiff were read to the jury. Plaintiff also read portions of defendant's evidence deposition to the jury because defendant was not present at the trial.

Dr. Richard Foellner, an osteopathic physician and one of plaintiff's primary physicians, testified he examined plaintiff on November 19, 1996. During that examination, plaintiff, who was 47 years old at the time of the accident, told Foellner that following the November 2, 1996, accident he was taken to Carle Foundation Hospital (Carle). He was released that same day but returned the next day. Neck X rays performed at Carle were normal. Plaintiff reported immediately after the accident he experienced pain in his head, neck, left knee, and left eye, and had difficulty focusing his vision. The day after the accident, plaintiff experienced some memory loss and was unable to walk in a straight line. Foellner completed a neurological examination and found plaintiff was "unsteady" on his feet. Because he was concerned about possible internal bleeding, he ordered a computerized axial tomography (CAT) scan. The CAT scan was normal.

During a November 21, 1996, follow-up appointment, plaintiff told Foellner he was still experiencing some dizziness. Foellner diagnosed plaintiff as having a concussion and a cervical spine strain, with some underlying age-related arthritis. Foellner explained cervical strain results from a sudden force being exerted upon inelastic tissue. To treat that condition, he performed osteopathic manipulative therapy on plaintiff's neck and shoulders. Foellner also opined plaintiff's concussion and cervical strain were causally connected to the November 2, 1996, accident.

Foellner next saw plaintiff on November 26, 1996, at which time plaintiff was still experiencing some head pain but felt better overall. When Foellner saw plaintiff again on February 5, 1997, plaintiff reported he had been experiencing daily headaches over the past four or five days. Foellner referred plaintiff to another osteopathic physician, Dr. Kappler, who examined plaintiff on March 11, 1997, and noted significant restriction in plaintiff's skull, neck, upper back, and rib areas.

On May 21, 1997, plaintiff reported to Foellner he was still having some mid-back pain, which Foellner opined could have been related to the automobile accident. At that time, Foellner referred plaintiff to Dr. Youngerman, an ear, nose, and throat specialist, because plaintiff had numbness around his left ear. The last time Foellner saw plaintiff for injuries related to the accident was in September 1997. Foellner stated plaintiff's disability from the accident appeared to last through March 1997. From the date of the accident through September 1997, Foellner billed plaintiff a total of $727. At the end of 1997, Foellner referred plaintiff to Dr. Eric Kivisto, an osteopathic general surgeon, because plaintiff had a breast mass.

Kivisto testified he first examined plaintiff in September 1998. During that examination, plaintiff reported that about two months after the accident, he developed a painful swelling in his right breast. Kivisto removed the mass and performed a biopsy, which revealed the lump was a benign, fatty growth. The surgery resulted in a two-centimeter-long permanent scar. Kivisto opined that striking a seat belt or a steering wheel during a car accident could cause such a growth. However, he noted other possible causes for the mass existed as well. He also stated no permanent disability was associated with the growth or its removal and no follow-up treatment was expected.

Dr. Joseph Alper, a neuropsychologist, testified he evaluated plaintiff on two occasions during November and December 1999, following a referral from plaintiff's counsel. According to Alper, neuropsychology is a board-certified speciality within the field of psychology that "deals with the treatment and assessment of the cognitive, emotional, [and] social influences of central nervous system dysfunction." During the evaluation, plaintiff reported that in the November 2, 1996, accident, he hit the back and top of his head and suffered a cut on the corner of his eye. He did not lose consciousness but became dizzy and fell over. He also did not suffer any memory loss regarding the events surrounding the accident. Plaintiff also told Alper that following the accident, he had problems with (1) his memory (in particular, difficulty remembering tasks), (2) memory attention (losing his train of thought), (3) communicating his thoughts and ideas, including "word[-]finding difficulties," (4) writing with his dominant right hand, and (5) balance. He also described subtle difficulties with his speech, and his wife described some subtle personality changes in plaintiff. At the time of the November 1999 evaluation, plaintiff and his wife felt all of plaintiff's difficulties had been "subjectively resolved."

Alper later administered several neuropsychological tests to assess plaintiff's sensory, perceptual, motor, visual, and spatial skills, his intellectual, memory, and language abilities, and his executive func-

tions. ("Executive functions" refers to a cognitive system within the brain that regulates and utilizes one's intellectual resources.) Alper testified plaintiff had some very mild relative impairments with the upper-right extremity and "slightly lower performances on some sensory, motor[,] and cognitive functions that are associated with the left hemisphere" of the brain. Alper stated the results were consistent with the symptoms plaintiff experienced following the accident. Plaintiff's cognitive abilities were within the broad range of average, and the only testing that fell in the borderline range was a portion of the test relating to "executive functions," specifically dysfunction in cognitive and motor functioning associated with the left hemisphere and language processing. Those dysfunctions might affect plaintiff's ability to plan, persevere, and accomplish goals in his farming occupation. Alper opined plaintiff would permanently remain in the same condition he was in at the time of the 1999 evaluation. He also opined plaintiff's problems could be related to the November 2, 1996, accident.

Dr. Jack Walz, a dentist who specializes in treating oral facial pain and both temporomandibular (jaw) joint and sleep disorders, testified that on April 27, 2000, he examined plaintiff. During that examination, plaintiff complained of jaw shifting when he was chewing, jaw fatigue after chewing, and jaw joint noises. Plaintiff reported he did not know how long his jaw had been shifting, but he had noticed it over the past three to five months. Plaintiff also reported a "plugging" sensation in his left ear, which he had been experiencing since shortly after the accident. Walz's examination revealed a grinding noise in plaintiff's left jaw joint, tenderness of his left jaw joint, unusual wear patterns on his teeth indicating grinding of his teeth, and a nodule on his lip (caused by biting his lip during uncoordinated jaw movements). Walz diagnosed plaintiff as suffering from degenerative jaw joint disease. Walz prescribed an oral appliance to reduce pressures applied to the jaw joint. He suggested plaintiff wear the appliance at night for the rest of his life. The appliance, which costs approximately $1,000, generally lasts between four and six years; however, they sometimes last as long as eight years or as short as two years. Walz also stated he will need to follow up with plaintiff once a year, at a cost of about $50 per annual visit.

Walz opined the most likely cause of plaintiff's jaw problems was the November 2, 1996, accident. Walz stated that although it was unusual for problems to manifest several years after an occurrence, it was possible that plaintiff had been experiencing some, if not all, of his symptoms for quite a while before he noticed them. Walz also stated plaintiff's jaw joint disease may cause him pain in the future

and render him more susceptible to arthritis and injury. Walz acknowledged that a 1998 incident, in which plaintiff was hit in the face with a piece of wood, was a possible cause of his degenerative jaw joint disease.

Plaintiff testified he had been a farmer since 1975. Before that time, he obtained a bachelor of arts degree in economics and attended three semesters of law school. Plaintiff stated the impact of the automobile accident caused his head to break the back window and dent the back window frame. His left elbow, left knee, left eye, and chest hit other parts of his truck during the crash. After the accident, he experienced difficulty with his vision, difficulty writing with his dominant right hand, difficulty walking in a straight line, and a plugging sensation in his left ear.

Plaintiff also testified Foellner referred him to Dr. Kenneth Renner, who examined a painful knot on his left elbow. Prior to the accident, he had no problems with his jaw or growths on his body. Plaintiff stated he did not recall telling Alper his problems had been resolved at the time of his November 1999 evaluation. He acknowledged he no longer had any vision problems, but he has to "hyperfocus" to retain information. Plaintiff also acknowledged he was able to conduct his day-to-day business and personal affairs and, other than Alper, he had not seen a specialist for his head injury.

Plaintiff's wife testified she was in the truck with plaintiff at the time of the accident in question. Although plaintiff did not lose consciousness, he fell over onto her lap. After the accident, plaintiff had a lot of difficulty remembering things he had known his entire life. He had a hard time expressing himself and making decisions. He still had difficulty processing information quickly and remembering directions. She also noticed plaintiff's personality had changed since the accident in that he was more quiet. She recalled telling Alper plaintiff's more serious problems had been resolved at the time of the November 1999 evaluation.

Plaintiff's exhibit No. 1 showed past medical expenses totaling $15,347.83.

Based on this evidence, the jury awarded plaintiff $900,000, as follows: $100,000 for past and future medical expenses, $500,000 for pain and suffering, and $300,000 for disability.

Defendant filed a motion for a new trial or a remittitur, which the trial court denied following a January 2001 hearing. This appeal followed.

## II. ANALYSIS

### A. Plaintiff's Counsel's Comments During *Voir Dire* and Opening Statements

Defendant first argues plaintiff's counsel made improper comments during *voir dire* and opening statements implying that defendant's admission of liability restricted plaintiff from presenting evidence to the jury.

During *voir dire*, the following colloquy took place:

"[PLAINTIFF'S COUNSEL]: [Prospective juror], because the [d]efendant has admitted liability in this case, the—there are restrictions on what evidence can be offered about the occurrence. As the [p]laintiff with the burden of proof[,] we are limited in that respect. One of the things I'm concerned about is since we are limited as a matter of law and cannot present certain evidence, would that leave questions in your mind that might leave us at a disadvantage?

[DEFENDANT'S COUNSEL]: Judge, I'm going to object to the form of the question. There is an inference [*sic*] that there is something this jury is not going to hear. They're going to hear all the evidence in this case.

THE COURT: I'll permit you to rephrase, [plaintiff's counsel].

[PLAINTIFF'S COUNSEL]: Because the [d]efendant has admitted liability in this case[,] the plaintiff is restricted in the evidence that he can offer as to the circumstances, all the background and circumstances. And one of the things I'm concerned about is from, you know, what you mentioned earlier is that since we cannot offer that evidence would we be at a disadvantage?

[DEFENDANT'S COUNSEL]: Same objection, Judge. The suggestion that somehow—

THE COURT: May I see counsel here, please. (Whereupon a [sidebar] conference was held.)

[PLAINTIFF'S COUNSEL]: [Prospective juror], relative to this case[,] since the [d]efendant has admitted liability[,] we won't be able to present any evidence on the issue of liability. We can only present evidence on the issue of damages and injuries. And in that posture[,] would that leave unanswered questions in your mind that you might hold against us relative to the liability issue?"

Plaintiff's counsel then made the following comment during opening statements:

"As you know, and [h]is Honor has told you, the attorneys have told you, the defendant has admitted liability. Now what that does as far as evidence that you will hear, that restricts the plaintiff—both parties in what evidence they can show and they can present. So, unfortunately, there may be some evidence that you might

want—wish to have heard, but because the admission of liability would prevent us from doing so—

[DEFENDANT'S COUNSEL]: Judge, I am going to object to the inference [*sic*] that this jury is not going to hear all of the evidence in this case.

THE COURT: Well, not necessarily adopting the rationale articulated, but I sustain the objection."

While we agree with defendant that plaintiff's counsel's statements were improper, we, however, find nothing in those statements constitute reversible error.

Defendant cites *Crutchfield v. Meyer*, 414 Ill. 210, 214, 111 N.E.2d 142, 144 (1953), *Skelton v. Chicago Transit Authority*, 214 Ill. App. 3d 554, 582, 573 N.E.2d 1315, 1334 (1991), and *L.D. Brinkman & Co.-Midwest v. National Sponge Cushion Co.*, 76 Ill. App. 3d 683, 695, 394 N.E.2d 1221, 1229 (1979), for the proposition that reversible error exists when counsel suggests he wished to present some information but could not because his opponent somehow prevented him from doing so.

However, in *Skelton*, 214 Ill. App. 3d at 582, 573 N.E.2d at 1334, after the court noted the above proposition, it found counsel's comments were not sufficiently improper as to require a new trial. There, the defense counsel in his closing argument referred to the fact that the plaintiff had never offered certain evidence, and the jury had never been told precisely what happened and why it happened. *Skelton*, 214 Ill. App. 3d at 582, 573 N.E.2d at 1334.

In *Crutchfield*, 414 Ill. at 213-15, 111 N.E.2d at 143-44, the court found the plaintiff was denied a fair trial because of statements the defense counsel made in his *closing argument*. While the court noted *both counsel acted improperly*, the defendant's counsel called the jury's attention to the fact the trial court did not permit defendant to testify to an issue because of the plaintiff's objection. *Crutchfield*, 414 Ill. at 213-14, 111 N.E.2d at 143-44. Such conduct suggested the counsel was attempting to convey to the jury the defendant had material and valuable evidence to give but was denied the opportunity by the plaintiff's technical objection. *Crutchfield*, 414 Ill. at 214, 111 N.E.2d at 144.

In *L.D. Brinkman*, 76 Ill. App. 3d at 694, 394 N.E.2d at 1229, the defense counsel in his opening statement stated he could not talk about certain conversations, and in closing argument, he commented on certain tests that were not in evidence. The court noted such statements were improper. *L.D. Brinkman*, 76 Ill. App. 3d at 695, 394 N.E.2d at 1229. The court then found based on the closeness of the evidence and *the combination of several errors*, including the improper

statement by defense counsel, the plaintiff was denied a fair trial. *L.D. Brinkman*, 76 Ill. App. 3d at 695, 394 N.E.2d at 1229-30.

■ Here, plaintiff's counsel was conveying to the jury that because no issue of liability existed, no evidence to prove defendant's liability would be presented. Further, the improper statements were made in *voir dire* and near the very beginning of plaintiff's opening statement. As pointed out by plaintiff, the objections made to counsel's *voir dire* questions were *as to form* and the questioned individual was not selected to hear the case. Moreover, when plaintiff's counsel posed the question for a third time in a different form, defendant did not object. As to the remark in plaintiff's opening statement, defendant objected, and the trial court sustained the objection. Thereafter, direct and cross-examination of all the witnesses in the case took place, followed by closing arguments by both attorneys and full Illinois pattern jury instructions from the trial court. The record does not reflect any disagreement on or objection to the instructions submitted to the jury.

Accordingly, we find plaintiff's counsel's remarks during *voir dire* and in his opening statement do not constitute reversible error.

### B. Plaintiff's Counsel's Comments During Closing Argument

Defendant next argues plaintiff's counsel made improper comments during his closing argument that constituted reversible error.

In his initial statement, plaintiff's counsel commented as follows:
> "[Defendant's counsel's] medical opinion, he is a lawyer like me. That's not an opinion. It is not evidence. It may be something that is generated to try to confuse you or to try to say, oh, you should substitute your opinion for the doctors'. *Believe me, if there were doctors available to contradict the opinions that you heard, they— would have—he would have presented them.*" (Emphasis added.)

Later, during rebuttal, plaintiff's counsel argued "[i]f there would have been an orthodontist, another dentist, someone who could come in and say Walz is full of it, [defendant's counsel] would have had them here." Defendant's attorney objected to both comments. The trial court overruled his first objection. As to the second objection, the trial court stated the following: "Folks, consider only the evidence. The arguments are to assist you."

■ Generally, a party may not comment upon his opponent's failure to call a witness who is not under the opponent's control or who is equally available to both parties. The danger from such comments is the jury will presume the testimony would have been unfavorable to the noncalling party. Nevertheless, counsel may argue the evidence and all reasonable inferences from it. *Lebrecht v. Tuli*, 130 Ill. App. 3d 457, 484, 473 N.E.2d 1322, 1341 (1985).

■ As in *Lebrecht*, 130 Ill. App. 3d at 484, 473 N.E.2d at 1341,

plaintiff's counsel's statements were made in the context of comparing and contrasting testimony presented on the cause of plaintiff's ailments. Here, plaintiff's counsel pointed out that plaintiff presented the only testimony as to the cause of plaintiff's claimed injuries. Such comment was proper. See *Lebrecht*, 130 Ill. App. 3d at 484, 473 N.E.2d at 1341.

### C. Plaintiff's Testimony Regarding the Knot on His Elbow

■ Defendant next argues the trial court erred in allowing the jury to consider plaintiff's testimony about a knot on his left elbow because plaintiff did not present any medical testimony establishing a causal connection between the November 2, 1996, accident and the knot.

Plaintiff testified he saw Renner because he had "some kind of a knot on [his left elbow,] and it was painful." Defendant objected when plaintiff's counsel asked when plaintiff first noticed the knot. Defendant argued plaintiff had not presented an expert opinion establishing a causal connection between the collision and the knot. The trial court overruled the objection, and plaintiff testified the knot had not been present before the November 2, 1996, accident. Plaintiff did not state the knot resulted from the accident.

In support of his argument, defendant cites *Stevenson v. Nauton*, 71 Ill. App. 3d 831, 390 N.E.2d 53 (1979), a medical malpractice case. In professional malpractice cases, expert testimony is generally necessary to establish both (1) the standard of care expected of the professional and (2) the professional's deviation from the standard caused the plaintiff's injury. *Jones v. Chicago HMO Ltd. of Illinois*, 191 Ill. 2d 278, 295, 730 N.E.2d 1119, 1130 (2000). In ordinary negligence cases, no general rule requiring expert testimony exists. See *Jones*, 191 Ill. 2d at 295, 730 N.E.2d at 1130. The alleged damages in this case arose out of ordinary negligence. Moreover, we find the facts of this case pertaining to plaintiff's elbow did not require expert testimony.

Accordingly, we find the trial court did not err in allowing the plaintiff to testify about the knot on his elbow.

### D. Damage Award
#### 1. *Pain and Suffering and Disability*

■ Defendant contends the jury's verdict of $500,000 for pain and suffering and $300,000 for disability was excessive and against the manifest weight of the evidence. We disagree.

In considering whether a verdict is excessive, a court must look at such factors as "(1) the permanency and extent of the injuries suffered, (2) the plaintiff's age, (3) the possibility of deterioration in the future, (4) the medical expenses incurred, (5) past and future lost

wages, and (6) any restrictions that the injury may have placed on the plaintiff's daily activities." *Snelson v. Kamm*, 319 Ill. App. 3d 116, 131, 745 N.E.2d 128, 142 (2001), *appeal pending*, Nos. 91232, 91239 cons.

Plaintiff testified to a number of physical ailments that occurred after the accident. He stated he had problems with his jaw, he was grinding his teeth while sleeping, and now wears an appliance on his teeth at night. Plaintiff also testified to a lump on his chest that was removed and a knot on his elbow both of which were not present before the accident. Plaintiff indicated he had vision problems and a plugged sensation in his ear. He also stated he has had difficulty communicating, has to "hyperfocus" to retain information from conversations, and planning crops and making crop sales are stressful and requires decisions to be broken up. Additionally, his life expectancy was established at 26 years.

Plaintiff's wife testified that since the accident, plaintiff has had difficulty remembering and trouble expressing himself and has a hard time making decisions. She also stated plaintiff never had any growths or lumps on his body or any trouble with his elbow prior to the accident.

Alper testified plaintiff's cognitive and motor function impairments could have been related to the injuries sustained in the accident. Further, plaintiff's condition would remain the same as his 1999 evaluation. Alper also testified that plaintiff's executive function difficulties could affect his ability to plan and meet the demands of farming.

Walz, a dentist specializing in treating jaw joint problems, testified the most likely cause of plaintiff's ailments was the auto accident. Walz stated plaintiff will have some long-term impairment with the possibility of developing arthritis in the jaw joint area and being more susceptible to future injury.

A jury's award of damages is entitled to substantial deference on review. *Snover v. McGraw*, 172 Ill. 2d 438, 447, 667 N.E.2d 1310, 1315 (1996). A personal injury award for damages " 'must be examined in the light of the particular injury involved, with humble deference to the discretion of the jury and the judgment of the trial court.' " *Epping v. Commonwealth Edison Co.*, 315 Ill. App. 3d 1069, 1073, 734 N.E.2d 916, 919 (2000), quoting *Kopczick v. Hobart Corp.*, 308 Ill. App. 3d 967, 979, 721 N.E.2d 769, 779 (1999). Based on the evidence, we find the jury's $500,000 award for pain and suffering and $300,000 award for disability was not excessive.

### 2. *Past and Future Medical Expenses*

■ Defendant also argues the jury's $100,000 award for plaintiff's

past and future medical expenses was excessive and unsupported by the evidence. On review, courts will not interfere with the jury's damage assessment unless the "award bears no reasonable relationship to the loss suffered." *Gill v. Foster*, 157 Ill. 2d 304, 315, 626 N.E.2d 190, 195 (1993). However, the jury enjoys a certain degree of latitude in awarding compensation for medical costs that, as shown by the evidence, are likely to arise in the future but are not specifically itemized in the evidence. *Richardson v. Chapman*, 175 Ill. 2d 98, 112, 676 N.E.2d 621, 628 (1997).

Plaintiff claimed his past medical expenses totaled $15,347.83. As to future medical expenses, Walz testified plaintiff's oral device would require replacement every four to six years (although it could require replacement from as little as two years to as many as eight years). Based on Walz's two-year figure and the approximate $1,000 cost of the device, the maximum amount the jury could award plaintiff, based on his life expectancy of 26 years, would be $13,000. Further, dental appointments at $50 per year would translate into $1,300 for future medical expenses. Therefore, plaintiff's future medical expenses would total $14,300 which, along with the medical expenses of $15,347.83 already incurred, would total $29,647.83.

The jury's award of $100,000 for past and future medical expenses was over three times the amount established in the trial court and not supported by the evidence. Thus, we find the appropriate figure for past and future medical expenses is $29,647.83, reducing plaintiff's total damages to $829,647.83. Accordingly, remittitur is required, and consistent with our powers under Supreme Court Rule 366(a)(1) (155 Ill. 2d R. 366(a)(1)), we reduce the jury's damage award in plaintiff's favor against defendant to $829,647.83.

## III. CONCLUSION

For the reasons stated, the trial court's judgment is affirmed as modified.

Affirmed as modified.

McCULLOUGH, P.J., concurs.

JUSTICE STEIGMANN, dissenting:

Because I believe the improper remarks of plaintiff's counsel during *voir dire* and opening statements constitute reversible error, I respectfully dissent.

Although the majority appropriately concludes that plaintiff's counsel's statements were improper, it does not find those statements

constitute reversible error. In my judgment, these statements were highly prejudicial and, due to their repetition, deprived defendant of the fair trial to which he was entitled.

Courts have consistently held that counsel commits reversible error when he suggests that there was information he wished the jurors to know but could not present to them, thus implying that the opposing party somehow denied the jury the opportunity to consider that information. *Crutchfield*, 414 Ill. at 214, 111 N.E.2d at 144; *Skelton*, 214 Ill. App. 3d at 582, 573 N.E.2d at 1334; *L.D. Brinkman & Co.-Midwest*, 76 Ill. App. 3d at 695, 394 N.E.2d at 1229; see also *Cancio v. White*, 297 Ill. App. 3d 422, 431, 697 N.E.2d 749, 755 (1998) (counsel's improper argument or misconduct may be a sufficient basis for a new trial).

In this case, the comments of plaintiff's counsel during *voir dire* and opening statements implied that by admitting liability, defendant was restricting plaintiff's ability to present evidence to the jury. Counsel's comments, which invited the jurors to speculate regarding the nature of the evidence they were denied the opportunity to hear, were prejudicial, improper, and wholly avoidable. I agree with defendant that plaintiff's counsel's repetition of essentially the same question three times during *voir dire*, over defendant's objections, reinforced the inference that defendant was attempting to prevent the jury from hearing evidence. See *Geisberger v. Quincy*, 3 Ill. App. 3d 437, 441, 278 N.E.2d 404, 406 (1972) ("the continued effort to introduce immaterial evidence requiring opponent to make innumerable objections creates in the juror's mind an impression that an objecting party is attempting to conceal evidence").

The situation this case presents is akin to that in criminal cases where a prosecutor makes comments about evidence that the trial court specifically suppressed or excluded. The supreme court has held that a prosecutor exceeds the bounds of permissible argument when he suggests that evidence of guilt existed which the jury could not hear because of its inadmissibility. *People v. Emerson*, 97 Ill. 2d 487, 497, 455 N.E.2d 41, 44-45 (1983); see *People v. Ray*, 126 Ill. App. 3d 656, 661, 467 N.E.2d 1078, 1082-83 (1984) (prosecutor committed reversible error when he told the jury in closing that "I have all of this that says" the defendant lied, and "I wish I could give you my file as you sit there to go back in there, but I'm not allowed to because that is the law"). Such comments are highly prejudicial. As the supreme court noted in *Emerson*, 97 Ill. 2d at 497, 455 N.E.2d at 45, "an insinuation which leaves the jury to speculate may be more prejudicial than erroneously admitted specific proof." Similarly, in this case, plaintiff's counsel's insinuation that defendant's admission of liability prevented

the jury from hearing evidence left the jury to speculate about the nature of that evidence and was extremely prejudicial.

I recognize that the trial court sustained defendant's objection to plaintiff's counsel's comment during opening statement. However, the court did not—as it should have—instruct the jury to disregard the remark. In addition, the evidence connecting many of plaintiff's injuries to the November 2, 1996, accident was not overwhelming, and the jury may well have returned a different verdict had counsel not made the improper comments during *voir dire* and opening statements. See *Crutchfield*, 414 Ill. at 214, 111 N.E.2d at 144 (judgments may be reversed because of prejudicial comments by counsel "even though the trial court sustained objections to such statements, rebuked counsel[,] and directed the jury to disregard the statements"). Under these circumstances, I conclude that counsel's comments prejudiced defendant and denied him a fair trial.

The majority mentions that plaintiff's counsel's improper statements were made in *voir dire* and near the very beginning of plaintiff's opening statement, implying that because these improprieties occurred at the beginning of the jury trial, their prejudicial effect may have dissipated by the time the case was over and the jury began its deliberations. However, this was a one-day jury trial; thus, the improper statements would still be fresh in the jury's mind as it considered the case.

Further, given that this was a one-day jury trial and addressed only the issue of damages, this court should hesitate to accept a verdict which lacks our full confidence because of the improper behavior of the prevailing attorney. The majority's conclusion, reducing the jury's damage award but affirming the judgment, still awards plaintiff over $829,000. Surely, we ought to insist upon a repeat of this one-day jury trial so that before a multi-hundred-thousand-dollar judgment is imposed on defendant, we can be confident that he received a fair trial. On this record, that confidence does not exist.