CECIL NEWELL, Plaintiff-Appellee, *v.* JESSE J. CORRES, M.D., Defendant-Appellant.

First District (2nd Division)    No. 83—2340

Opinion filed June 26, 1984.

Clausen, Miller, Gorman, Caffrey & Witous, P.C., of Chicago (James T. Ferrini, Kevin J. Glenn, and Katherine S. Dedrick, of counsel), for appellant.

Ernest K. Koehler, of Chicago, for appellee.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

In an action for medical malpractice, the circuit court directed a verdict as to liability in plaintiff's favor, upon which a comparative negligence verdict favoring plaintiff was reached. Judgment was entered and defendant appeals.

Defendant raises as issues whether: he is entitled to judgment *n.o.v.* or a new trial based upon evidence relating to proximate cause; and plaintiff's alleged refusal to submit to the accepted medical treatment for his jaw fracture is a circumstance affecting the applicable standard of care.

At trial, plaintiff called defendant as an adverse witness under section 2—1102 of the Code of Civil Procedure. (Ill. Rev. Stat. 1983, ch. 110, par. 2—1102.) Defendant, a specialist in plastic and general surgery, testified that on August 24, 1980, he saw plaintiff at Englewood Hospital, where he had been admitted the previous day with a fractured and malaligned left lower jaw. Defendant spoke to him for about 20 to 30 minutes and explained two alternative treatments for his injury. The first involved the use of arch bars, which are braces affixed to the teeth of the upper and lower jaw and then fastened together, bringing the teeth into normal occlusion (bite) and thereby aligning the fracture. Plaintiff said he didn't want his mouth to remain shut for the six weeks required if arch bars are applied. Defendant then explained the alternative treatment, whereby the fracture would be realigned and the fractured bone wired together surgically; if sufficiently stable, braces would not be needed. Plaintiff requested the alternative treatment.

According to defendant, arch bars, because they could be used with "no cutting" and are the "least invasive care," are the best form of treatment. The alternative method was acceptable provided the patient is kept in the hospital for one week, so that some bone healing can begin, and is closely supervised upon discharge. The alternative treatment permits the patient to open and close his mouth, and the jaw is thereby subject to reinjury; therefore, the patient needs to be "good" and must be "talk[ed] to." The written consent to the operation, signed by plaintiff, was for both "[p]ossible open or closed reduction of fracture of left mandible," because arch bars would have to be applied if the stability of plaintiff's jaw after surgery proved unsatisfactory.

Defendant testified that he performed the operation on August

25, 1980, using 26-gauge surgical wire. The operation record notes, however, that 28-gauge wire was used. Surgical wire is classified according to tensile strength; 22-gauge wire is stronger than 28-gauge wire. The next day he examined plaintiff and found his occlusion good. At 5 a.m. on August 28, a nurse at the hospital called defendant informing him that plaintiff was signing himself out of the hospital against medical advice. Defendant advised the nurse to tell plaintiff to call him the next day, but plaintiff failed to do so.

Called as an expert witness by plaintiff, Dr. Norman Trieger, doctor of medicine and dentistry and an oral surgeon, examined plaintiff on November 3, 1980. For patients with jaw fractures who have an adequate number of teeth, such as plaintiff, the "major effort" is to use closed reduction, specifically the application of arch bars, which are "the accepted and best medical approach to a fractured mandible." The next step, if closed reduction alone is insufficient, is open reduction "used in conjunction with the arch bars." In light of plaintiff's refusal of arch bars, the "best and most applicable" treatment would have been open reduction with wire fixation, along with a "lingual or plastic splint," because "you have to support that [open reduction with wire fixation] with something else." Had defendant used arch bars here, the subsequent displacement of the fracture would not have occurred. The treatment provided by defendant—open reduction using 26- or 28-gauge wire without arch bars—"is really not the standard of care" and subsequently "led to further problems including the need for further surgery." The treatment was inadequate to counteract heavy muscle forces, especially in a young, healthy male such as plaintiff with his degree of fracture.

Plaintiff, 28 years old at the time of trial, testified that on August 22, 1980, his jaw was broken when several men mugged him. He was admitted to Englewood Hospital the next day. Following his admission, defendant spent two to three minutes with him and told him an operation would be required to treat him. On cross-examination, plaintiff acknowledged that in his deposition he had said this meeting lasted 10 minutes. Defendant did not ask plaintiff then whether he wanted his mouth wired shut nor did he mention braces or arch bars. He also did not state how long plaintiff would remain hospitalized. Although his jaw was painful after the operation on August 25, the pain increased during the next two days. On August 27, the swelling of his face had increased, and he unsuccessfully tried to contact defendant through the nurses. On August 28, plaintiff signed a release form to check himself out of the hospital and went straight home to bed. He felt worse the next day, which was Friday. On Saturday, August 30,

his father drove him to Cook County Hospital, where he was examined and X-rayed and told to return the following Tuesday to the oral surgery clinic. He remained at home all weekend and returned on Tuesday, September 2, to Cook County Hospital. He was advised then that "it would be very dangerous" for him to go back out in the street. He nevertheless went out, returning that evening, when he was admitted to the hospital. He did not object when told his mouth would be wired shut, and arch bars were put into his mouth. Upon his discharge from the hospital a week later, he felt "[l]ike a new person." About a month afterward, his jaw became swollen and he returned to Cook County Hospital, where he was again operated on, remaining there for a week.

The evidence deposition of Dr. Steven J. Traub, who in September 1980 was chief resident in oral and maxillofacial surgery at Cook County Hospital, was read into the record. He saw plaintiff initially on September 2, 1980, following his admission to the hospital. He diagnosed that plaintiff's fracture was displaced because of improper realignment of the bones; he disagreed with the Cook County Hospital radiologist's report which noted that the fracture appeared in "good position." He operated on plaintiff and found fracture displacement. Plaintiff was readmitted to Cook County Hospital on October 8, 1980, with a jaw abscess caused by infection of the fracture area. The abscess was surgically drained; six days later, another operation was performed to remove the surgical wires as a potential source of infection. Dr. Traub speculated that plaintiff's fracture could have been displaced after his release from Englewood Hospital, because "the fact that *** [plaintiff] wasn't put in intermaxillary fixation [arch bars] leads to the most probable cause." The generally accepted procedure for jaw fractures is "maxillary and mandibular arch bars, followed by manipulation of the jaw into proper occlusion, and then intermaxillary fixation." In plaintiff's case, the correct treatment would have been to apply arch bars, X-ray the jaw, and then decide whether open reduction was also required. When asked what he would do if a patient refused arch bars, Dr. Traub replied, "I'd advise him to get somebody else to take his case."

Dr. Charles Janda, plastic surgeon and licensed dentist, testified as defendant's expert. After reviewing plaintiff's medical records and presuming his refusal of arch bars, Dr. Janda was of the opinion that, under the circumstances, defendant's treatment of plaintiff was "adequate." Although Dr. Janda would have used a wire thicker than 26-gauge, he felt it was "adequate enough wire to do the job." On cross-examination, he conceded that the procedure used was not the

standard of care for fractured jaws in Cook County. For patients with teeth, the standard of care requires the use of arch bars, "the ideal way to do it." Confronted with a patient refusing arch bars, he would "back off" and suggest the patient "go elsewhere." Based on his review of Cook County Hospital records, he felt the subsequent procedures there were "unnecessary."

The circuit court granted plaintiff's motion for a directed verdict as to liability. The jury then assessed plaintiff's damages as $75,000, reducing this by one-third, the degree of comparative negligence found attributable to him. After denying defendant's timely post-trial motion to vacate, for judgment *n.o.v.*, for a new trial, and for *remittitur*, the circuit court entered judgment for plaintiff in the amount of $50,000. This appeal followed.

I

Defendant initially contends that, because the record is barren of any evidence of proximate causation, he is entitled to judgment notwithstanding the verdict or to a new trial.

The plaintiff bears the burden of establishing each element necessary to constitute a cause of action for medical malpractice (*Burrow v. Widder* (1977), 52 Ill. App. 3d 1017, 1023, 368 N.E.2d 443), including the standard of care applicable to a physician's conduct, that the physician was negligent in light of this standard, and that this negligence proximately caused plaintiff's injury. (*Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 423, 328 N.E.2d 301.) Plaintiff sustains his burden by proving, generally through expert testimony, that defendant's breach of the applicable standard of care is more probably than not the cause of plaintiff's injury. (*Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 424; see *First National Bank v. Porter* (1983), 114 Ill. App. 3d 1, 12, 448 N.E.2d 256; *Burrow v. Widder* (1977), 52 Ill. App. 3d 1017.) Proximate cause is not established, however, where the causal connection is "contingent, speculative or merely possible." *Manion v. Brant Oil Co.* (1967), 85 Ill. App. 2d 129, 136, 229 N.E.2d 171.

Defendant urges that the testimony of Dr. Trieger, plaintiff's expert, was too speculative to establish proximate cause. Although some of his testimony may have been speculative or hypothetical in nature, Dr. Trieger also testified that plaintiff's care at Englewood Hospital did not meet the generally accepted standard of care and that this "inadequate treatment *** led to further problems including the need for further surgery." He further noted that the displacement

of the fracture would not have occurred if defendant had applied arch bars. Judgment *n.o.v.* is properly entered only where all the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504.) Upon Dr. Trieger's testimony alone then, the circuit court correctly denied defendant's motion for judgment *n.o.v.*

Other evidence, by contrast, suggested that defendant's treatment of plaintiff did not proximately cause the subsequent surgical procedures: Dr. Janda, defendant's expert, testified that these later procedures were "unnecessary"; defendant testified that he didn't understand the purpose of these procedures, as the emergency room records from Cook County Hospital indicated that plaintiff's jaw was stable. This conflict in expert medical testimony presented a question of fact to be resolved by the jury as trier of fact. (*Soberalski v. Chicago Rock Island & Pacific R.R. Co.* (1975), 29 Ill. App. 3d 1019, 1029, 331 N.E.2d 645.) Moreover, an item of evidence highly relevant to the issue of proximate cause—the X ray taken at Cook County Hospital—was also the subject of considerable controversy. Plaintiff's expert testified that this X ray depicts plaintiff's jaw and shows significant displacement of the fracture, thus indicating that subsequent remedial measures, including surgery, were necessary. Defendant and his expert, contrariwise, maintained that this X ray is of a person other than plaintiff; furthermore, plaintiff's witnesses conceded that a physician examined plaintiff at Cook County Hospital on September 2, 1980, and found him to have a "normal bite," and that a Cook County radiologist on the same date found plaintiff's fracture to be in "good position." These facts suggest that the subsequent treatment may have been proximately caused by an intervening reinjury of plaintiff's jaw.

■ Motions for directed verdicts at the close of all the evidence are evaluated by the same stringent standard applied to judgments *n.o.v.* (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510; *Borowski v. Von Solbrig* (1975) 60 Ill. 2d 418, 423.) Viewing the foregoing evidence in its aspect most favorable to defendant, it cannot be said that a verdict in defendant's favor would be impossible, or even unlikely. A genuine question of fact as to causation was presented here. The circuit court's directed verdict of liability in plaintiff's favor was in error. The cause must be reversed and remanded for a new trial.

## II

██ █ Defendant next maintains that the circuit court erred by directing a verdict based on its finding that a single standard of care had been established. In a medical malpractice action, the standard of care against which such a defendant's conduct is measured is not the highest degree of skill possible, but the reasonable skill which a physician in good standing in the community would use in a similar case. (*Taber v. Riordan* (1980), 83 Ill. App. 3d 900, 904, 403 N.E.2d 1349; *Spike v. Sellett* (1981), 102 Ill. App. 3d 270, 273, 430 N.E.2d 597.) Where alternative methods of treatment are shown to be proper, the physician's choice of one method over another, even where injury results, is not a deviation from the standard of care. *Roberts v. Tardif* (Me. 1980), 417 A.2d 444, 448-49; *Donaldson v. Maffucci* (1959), 397 Pa. 548, 554, 156 A.2d 835, 838; 1 D. Louisell & H. Williams, Medical Malpractice par. 8.04, at 204 (1983); see also *Ybarra v. Cross* (1974), 22 Ill. App. 3d 638, 644, 317 N.E.2d 621.

In the case at bar, both plaintiff's and defendant's experts, as well as defendant himself, agreed that the least intrusive and most effective treatment for jaw fractures in patients with teeth, such as plaintiff, is the application of arch bars, whether alone or in conjunction with open reduction. These experts cited alternative methods of treatment for patients with specialized problems, such as breathing and seizure disorders or fractures with bone loss, none present here. Moreover, the particular alternative methods cited did not include that used here by defendant. As to the treatment used—open reduction without arch bars or any other stabilizing device besides 26- or 28-gauge wire—both plaintiff's and defendant's experts testified that it did not conform to the prevailing standard of care. Defendant's expert also said that, in view of plaintiff's purported refusal of arch bars, the instant treatment was "adequate."

██ Defendant insists that plaintiff's refusal of the preferred treatment, coupled with testimony that the treatment actually given was "adequate," presented a fact question regarding the standard of care which was improperly resolved by the circuit court's directed verdict. Refusal of "standard" treatment by a competent adult patient fully cognizant of the potential consequences of his refusal, after the physician's reasonable explanation of the necessity of the preferred treatment, is a complete defense to a charge of malpractice resulting from the physician's failure to give the treatment; whether the treatment was offered and refused is a question of fact. (See *Littlejohn v. Arbogast* (1900), 95 Ill. App. 605, 608; *Steele v. Woods* (Mo. 1959), 327 S.W.2d 187, 196; *Richeson v. Roebber* (1941), 349 Mo. 132,

159 S.W.2d 658; *Hunter v. United States* (M.D. Tenn. 1964), 236 F. Supp. 411, 415; *Peterson v. Branton* (1917), 137 Minn. 74, 162 N.W. 895; see also 70 C.J.S. *Physicians and Surgeons* sec. 51(c), at 974 (1951); 61 Am. Jur. 2d *Physicians, Surgeons, & Other Healers* sec. 303, at 451 (1981); Annot., 93 A.L.R.3d 67, 71 (1979); Annot., 50 A.L.R.2d 1043, 1053-54 (1956.) Although under comparative negligence principles a patient's refusal may not be a complete defense, it is a factor to be weighed by the jury in determining the relative degree of negligence attributable to the parties.

■ In precluding the jury's consideration of this refusal factor by directing a verdict as to liability, the circuit court ignored the dilemma confronting a physician when a patient in need of immediate care refuses the "standard" treatment. If the physician advises the patient to "go elsewhere," he risks potential liability for abandoning his patient (see *Magana v. Elie* (1982), 108 Ill. App. 3d 1028, 1034, 439 N.E.2d 1319); if he provides an "adequate," albeit less than ideal treatment, as here, he can also incur malpractice liability. Permitting the jury to evaluate the reasonableness of defendant physician's conduct, by considering the nature of the treatment provided, whether this treatment and the preferred treatment were fully explained to plaintiff, and whether plaintiff knowingly refused the preferred treatment, would squarely address this dilemma and make for a more equitable result. Comparative negligence, because of its flexibility, is particularly suited for such broad-based fact-finding. On remand, therefore, the jury should consider the reasonableness of defendant's professional conduct in light of all the relevant circumstances outlined above.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed and the cause remanded for further proceedings consistent with this opinion.

Reversed and remanded.

DOWNING and O'CONNOR, JJ., concur.