FIRST DIVISION

No. 1-08-0265

THOMAS MARTINEZ,                        )      Appeal from the
                                        )      Circuit Court of
    Plaintiff-Appellee,             )      Cook County.
                                        )
  v.                                   )      No. 03 L 015529
                                        )
SARMED ELIAS, M.D., and                )      The Honorable,
BONE & JOINT CENTER,                   )      James Varga,
                                        )      Judge Presiding.
    Defendants-Appellants.          )

PRESIDING JUSTICE HALL delivered the opinion of the court:

The plaintiff, Thomas Martinez, filed a medical malpractice case against the defendants, Sarmed Elias, M.D. and the Bone & Joint Center, alleging that Dr. Elias performed unnecessary procedures on the plaintiff's lower spine.  Following trial, the jury returned a verdict in favor of the plaintiff and against the defendants in the amount of $500,000.  The trial court granted the defendants' posttrial motion for a remittitur and reduced the jury award to $400,000.

The defendants appeal raising the following issues: whether the admission of a financial motive for the surgery was error and whether a new trial is required because the verdict was against the manifest weight of the evidence.  The plaintiff cross-appeals, challenging the granting of the remittitur.

I. BACKGROUND

A. Facts

The plaintiff, a journeyman carpenter, injured his lower back and right shoulder at work lifting a sheet of drywall on

November 14, 2000. At the time of his injury, the plaintiff was 42 years old and had underlying degenerative disc disease at multiple levels of his lumbar spine. The plaintiff was initially treated by several physicians before his primary care physician referred him to Dr. Sarmed Elias, an orthopedic surgeon.

Dr. Elias treated the plaintiff from January 11, 2001, to April 30, 2002. During the plaintiff's initial visit with Dr. Elias, he complained of daily, debilitating shoulder and back pain, which affected his ability to run, take long walks, and lift anything more than light weights. The plaintiff complained his back was stiff in the mornings and while sitting or driving; the stiffness of his back prevented him from sitting in one place for longer than an hour or two. He rated his pain at 3 to 4, on a scale of 10. The plaintiff felt he could not return to work given his pain.

On January 23, 2001, the plaintiff underwent an MRI of his spine. The MRI showed the L2-L3 disc was normal, with degenerative disc disease and mild stenosis at L3-L4, L4-L5, and L5-S1, and neuroforaminal narrowing and end plate changes at all three levels. The MRI of the plaintiff's shoulder showed a complete tear of the rotator cuff tendon; the plaintiff did not have this repaired. An X-ray taken January 26, 2001, showed a herniated disc at L4-L5. On January 27, 2001, an EMG was performed, which showed mildly active right radiculopathy, radiating pain, involving the L5-S1 level. On January 30, 2001,

Dr. Elias discussed the results of the tests with the plaintiff and recommended a discogram to confirm the diagnosis and identify the specific sites of pain.

A discogram is an outpatient diagnostic procedure where dye is injected into a disc space, increasing pressure in the space. The pressure created is intended to reproduce the patient's pain. The patient is asked to indicate where he feels pain and to rate the pain on a scale of 1 to 10. The discogram is done to determine which disc, if any, is the cause of the patient's pain. The results of the discogram may indicate the necessity for surgery or an intradiscal electrothermal therapy (IDET) procedure.

On May 7, 2001, the plaintiff saw another orthopedic surgeon, Dr. Howard Freedberg. Dr. Freedberg diagnosed the plaintiff with degenerative disc disease.

On July 26, 2001, the plaintiff returned to see Dr. Elias, reporting his pain as a 7 out of 10. Again, Dr. Elias recommended a discogram to confirm disc abnormalities.

On August 1, 2001, Dr. Elias performed the discogram. Based on the procedure, Dr. Elias concluded the plaintiff had herniated discs at L3-L4, L4-L5, and L5-S1, with grade five, through and through, annular tears at these levels.

At the plaintiff's next appointment, Dr. Elias recommended an endoscopic discectomy at L3-L4 and L4-L5 and the IDET procedure at L5-S1, as soon as possible.

An endoscopic discectomy is an outpatient surgical procedure to remove degenerated, nonfunctioning disc material.  With the assistance of X-ray fluoroscopy and a magnified video for guidance, a small specially designed endoscopic probe is inserted through the skin of the patient's back, between the vertebrae and into the herniated disc space.  Tiny surgical attachments are then sent down the hollow center of the probe to remove a portion of the offending disc.  The doctor is able to view the disc portion removal on a TV monitor.  During an IDET procedure, the doctor, with the assistance of a fluoroscope, inserts a small catheter into the disc to attempt to seal the tear in the annulus, the outer shell of the disc, using a temperature-controlled heat source inside the catheter.  No tissue is removed from the disc.

On December 28, 2001, Dr. Elias performed an endoscopic discectomy at L3-L4 and L4-L5 and the IDET procedure at L5-S1 on the plaintiff.  Following the procedures, the plaintiff experienced pain in his right leg for the first time.[1]

On April 25, 2002, the plaintiff went to see Dr. Francisco

---

[1]At his August 7, 2001, visit to Dr. Elias, following his discogram, the plaintiff completed a form indicating he had been experiencing leg pain for eight months.  At trial, the plaintiff explained that he had been experiencing back pain for eight months and had placed the entry in the wrong box on the form.

**4**

Gutierrez, complaining of pain in the lower lumbar area, radiating to the posterior area of his right leg. The plaintiff complained that the pain worsened when he remained in the same position too long. Dr. Gutierrez attributed the plaintiff's symptoms to severe degenerative disease at L3-L4, L4-L5, and L5-S1, producing three levels of bulging discs and severe stenosis at this area of the spine. He recommended lumbar fusion surgery to open the disc space, relieve nerve compression and stabilize the plaintiff's lumbar spine.

On April 30, 2002, the plaintiff returned to see Dr. Elias. Dr. Elias recommended myelogram injections to assess his condition. The plaintiff did not follow Dr. Elias's recommendation.

Two years later, on September 3, 2004, the plaintiff went to see an orthopedic surgeon, Dr. Thomas Gleason, complaining of right lower back and buttock pain radiating down to his right leg, causing a limp. Dr. Gleason took X-rays and noted moderate degenerative disc space narrowing at L3-L4 and L4-L5, with greater narrowing at L4-L5.

The plaintiff underwent a recommended EMG/NCV test and an MRI before returning to see Dr. Gleason on October 1, 2004. The new MRI showed degenerative disc disease with disc space narrowing at L3-L4, L4-L5, and L5-S1, mild stenosis at L3-L4 and L4-L5, and foraminal narrowing, a painful compression of the nerves, right greater than left, at L4-L5 and L5-S1. Dr. Gleason

**5**

diagnosed right lumbar radicular syndrome, pain in the lower back radiating down the right leg in a radicular-type nerve-root distribution.

On December 11, 2003, the plaintiff filed his complaint against the defendants, claiming that Dr. Elias breached his duty of care to the plaintiff by Dr. Elias's performance of surgical procedures on the plaintiff's spine and back on December 28, 2001. The plaintiff also alleged that Dr. Elias's negligent acts caused him to suffer severe and permanent injuries.

B. Pertinent Trial Testimony

Dr. Clarence Fossier, the plaintiff's retained expert, testified he had performed "thousands of discograms" during his career. He explained that the problem with discography was that 30% of the time the test renders a false positive. As a result, discograms are considered controversial in the orthopedic field in terms of concordant pain. In other words, if the discogram produces pain similar to the patient's usual pain, does that prove that the disc, which was injected, is the source of the patient's back pain? Dr. Fossier opined that Dr. Elias deviated from the standard of care by performing the plaintiff's August 1, 2001, discogram. Dr. Fossier identified "the standard of care [as] what a well-trained orthopedic surgeon would do in similar circumstances" and that the "vast majority" of orthopedic surgeons would not perform a discogram on their own surgical

patients because of the lack of objectivity it creates. Dr. Fossier concluded that Dr. Elias's performance of the discogram caused the plaintiff injury because it resulted in a false positive, leading to Dr. Elias's performance of unnecessary surgical procedures, the endoscopic discectomy and IDET procedure, on the plaintiff. Dr. Fossier opined that, based on the plaintiff's symptoms as they presented in 2001, no surgical procedures could have relieved his back pain because he did not have a radicular component. Dr. Fossier concluded that Dr. Elias breached the standard of care by relying on the discogram results to determine that surgical procedures were indicated.

Dr. Fossier testified further that Dr. Elias's performance of the endoscopic discectomy was also a deviation of the standard of care because it was not indicated, "was unnecessary," and "had no chance of curing [the plaintiff's] backache." Dr. Fossier testified the passage of the endoscope during the December 28, 2001, endoscopic discectomy surgery caused the plaintiff's radicular right leg pain. Dr. Fossier further opined that the surgery accelerated the degenerative process because the removal of disc tissue widened the annular opening, creating some scar tissue. However, during cross-examination, Dr. Fossier acknowledged that no one, including himself, could predict whether the procedure in 2001 adversely affected the natural progression of the plaintiff's disc degeneration.

Dr. Fossier testified the IDET procedure employed by Dr.

**7**

Elias is considered controversial in the area of orthopedic medicine. Dr. Fossier explained that the procedure was controversial because "it doesn't work." Dr. Fossier, acknowledged, however, that the procedure had a "theoretical basis to help" because the plaintiff had back pain.

Dr. Gary Skaletsky, a neurosurgeon, testified on behalf of the plaintiff. According to Dr. Skaletsky, it was a deviation from the standard of care for Dr. Elias to perform the plaintiff's discogram where he was also the surgeon who would perform any subsequent surgeries. Dr. Skaletsky opined that Dr. Elias deviated from the standard of care because the diagnostic test of the discogram showed a degenerative pattern that did not warrant either endoscopic surgery or the IDET procedure. At trial, Dr. Skaletsky attributed the plaintiff's radicular pain to Dr. Elias's performance of the two surgical procedures, not to the natural progression of the plaintiff's degenerative disc disease.

Dr. Anthony Yeung, an orthopedic spine surgeon specializing in endoscopic spine surgery, testified as an expert witness on behalf of the defendants. Dr. Yeung co-developed the Yeung Endoscopic Spine System, a series of instruments used in endoscopic spinal surgery. Dr. Elias attended one of Dr. Yeung's training courses in endoscopic spine surgery in 1999 and adopted his system. Dr. Yeung testified he believes "endoscopic spine surgery is going to be the future of spine surgery just like

**8**

arthrosporic knee surgery and shoulder surgery became the gold standard *** in the 1970s." Dr. Yeung admitted he is biased toward endoscopic spinal surgery.

Based on his review of the plaintiff's records and his own training and experience, Dr. Yeung concluded Dr. Elias conformed to the standard of care in his treatment and care of the plaintiff. Dr. Yeung testified the plaintiff was a good candidate for the discogram because he had an abnormal MRI indicating three discs that were potentially painful. Dr. Yeung explained that a discogram is necessary to determine whether an abnormality at a disc level that shows up on an MRI is the actual source of pain the patient is claiming to experience. Dr. Yeung stated "it is very important for the surgeon who is going to make the decision with respect to the need for surgery to do his own discogram." Dr. Yeung explained his rationale, testifying that because pain is subjective, having the surgeon perform the discogram allows the surgeon to correlate the type of pressure he places on the patient's disc with the pain findings reported by the patient to eliminate false positives, which in turn, provides the surgeon with objective evidence in deciding whether surgery is right for the patient. Dr. Yeung concluded it is within the standard of care for the surgeon that may later operate on the patient to perform the discogram himself. On cross-examination, Dr. Yeung acknowledged that the orthopedic surgeon that performs the patient's discogram may have a financial interest

recommending surgery based on the discogram's results. Dr. Yeung noted there is no "check" on the recommendation for surgery by another physician. Dr. Yeung stated there is a disagreement among spinal surgeons whether under these circumstances, the same surgeon should perform both the discogram and any indicated surgery on his own patient.

Dr. Yeung testified that based on Dr. Elias's findings during the discogram, the plaintiff was a proper candidate for the endoscopic spinal surgery and the IDET procedure. Dr. Yeung explained that because Dr. Elias did not evoke pain at the L2-L3 level while performing the plaintiff's discogram, he was able to validate the test. Dr. Yeung opined that because the patient indicated experiencing pain at the three different levels of his lumbar spine, the results of the discogram confirmed three disc abnormalities and endoscopic surgery was appropriate.

On cross-examination, Dr. Yeung conceded that the radicular pain the plaintiff complained of after the procedures by Dr. Elias was in some way attributed to or caused by those procedures. However, Dr. Yeung stated that radicular pain is a known risk of the surgery, which the standard of care requires be discussed with the patient; Dr. Yeung asserted that, based on his reading of the plaintiff's medical charts, Dr. Elias discussed this risk with the plaintiff.

Th jury returned a verdict in favor of the plaintiff in the amount of $500,000, including an award of $155,000 for the

plaintiff's future medical expenses. The trial court granted a remittitur and reduced the award for future medical expenses to $55,000.

## II. ANALYSIS

### A. <u>Denial of Motion in limine to Bar Motivation Evidence</u>

The defendants contend that the trial court erred when it denied the defendants' motion <u>in</u> <u>limine</u> to bar any reference or argument that economic motivation played any part in the care Dr. Elias rendered to the plaintiff. The defendants maintain that motive is not an element of a medical malpractice cause of action. Therefore, financial motivation is irrelevant to establishing the cause of action.

### 1. Standard of Review

The court applies the abuse of discretion standard to a review of a trial court's ruling on a motion <u>in</u> <u>limine</u>. <u>Schmitz v. Binette</u>, 368 Ill. App. 3d 447, 452, 857 N.E.2d 846 (2006). We will find an abuse of discretion only where no reasonable person would take the view adopted by the trial court. <u>Keefe-Shea Joint Venture v. City of Evanston</u>, 364 Ill. App. 3d 48, 61, 845 N.E.2d 689 (2005).

### 2. Discussion

To recover damages in a negligence medical malpractice action, a plaintiff must establish: (1) the proper standard of care, (2) a deviation from that standard, and (3) an injury proximately caused by the deviation from that standard of care.

<u>Purtill v. Hess</u>, 111 Ill. 2d 229, 241-42, 489 N.E.2d 867 (1986).
Expert medical testimony is required to establish the proper
standard of care and the defendant's deviation from that standard
unless the defendant's "negligence is so grossly apparent or the
treatment so common as to be within the everyday knowledge of a
layperson." <u>Purtill</u>, 111 Ill. 2d at 242.

The trial court denied the defendants' motion <u>in limine</u> to
exclude the motivation evidence because the court found it was
relevant to an issue in this case. "Relevant evidence" is that
which has "any tendency to make the existence of any fact that is
of consequence to the determination of the action more or less
probable than it would be without the evidence." <u>Wojcik v. City
of Chicago</u>, 299 Ill. App. 3d 964, 971, 702 N.E.2d 303 (1998).

The defendants argue that because motive is not an element
of a medical malpractice case, the trial court abused its
discretion in permitting this line of questioning and testimony.
The defendants further argue, "the error of allowing the non-
issue of motive into the case was compounded by the fact that
motive was allowed to become part of the standard of care." The
defendants contend that through the plaintiff's two experts and
the cross-examination of Dr. Elias's expert, the issue of
financial motive "was insinuated into the entire case as both an
element of the cause of action itself and the definition of the
standard of care." The defendants maintain that the error was
further compounded because motive became a major theme of the

**12**

plaintiff's closing argument. They conclude that this evidence deprived Dr. Elias of a fair trial because the "jury could wrongly infer from [the evidence] that it <u>must</u> consider the defendant's motive for doing the discogram and the surgeries because motive is part of the standard of care, and conclude, as occurred in this case, that the improperly defined standard of care was breached because of the irrelevant issue of motive."

In <u>Neade v. Portes</u>, 193 Ill. 2d 433, 739 N.E.2d 496 (2000), the supreme court was presented with the issue of whether, in a complaint alleging medical negligence, the patient had a cause of action for breach of fiduciary duty against the physician for that physician's failure to disclose financial incentives that existed under the physician's arrangement with the patient's HMO; the supreme court found the patient could not bring a claim of breach of fiduciary duty against the physician under those circumstances. <u>Neade</u>, 193 Ill. 2d at 435. The plaintiff's complaint alleged the physician defendant was negligent for failing to authorize certain diagnostic tests and by refusing to disclose his financial relationship with the patient's HMO. The trial court agreed with the defendants' argument that financial motive was not relevant to whether the defendant physician breached the applicable standard of care in treating the patient. <u>Neade</u>, 193 Ill. 2d at 437-38. The appellate court agreed with the trial court that the allegations relating to financial motive are not appropriate in a medical negligence claim, but held that

**13**

evidence relating to this issue may be relevant at trial to attack the defendant physician's credibility if he testified. Neade, 193 Ill. 2d at 439. The supreme court agreed with the appellate court that the evidence of financial incentives could be relevant at trial, noting "[t]he relevance and admission of such evidence is for the discretion of the trial court." Neade, 193 Ill. 2d at 450.

The defendants also rely on Bearden v. Hamby, 240 Ill. App. 3d 779, 608 N.E.2d 282 (1992). In that case, this court reviewed a contempt citation for refusal to produce tax returns the plaintiff claimed were relevant to establish the "motive" for the defendant physician's breach of the standard of care. Bearden, 240 Ill. App. 3d at 783. We found the tax returns irrelevant because why the defendant physician breached the applicable standard of care was not relevant to the determination of whether the defendant physician breached the standard of care. See Bearden, 240 Ill. App. 3d at 783.

Here, the plaintiff argued the financial incentive evidence established the breach of the standard of care because spinal surgeons should not perform and interpret discograms for their potential surgical patients because the presence of financial incentive, regardless of whether it actually motivated the surgeon, destroys the guarantee of objectivity in the discogram. Accordingly, the evidence of financial incentive directly addressed whether Dr. Elias breached the standard of care, not

**14**

<u>why</u>.  As such, we find <u>Bearden</u> inapposite.

The defendants maintain that the surgical procedures were indicated to treat the plaintiff's complaints of back pain and that the discogram was the proper diagnostic test for Dr. Elias to rely on in determining to proceed with the surgical procedures.  However, the surgical procedures performed by Dr. Elias were not indicated, in part because, prior to the surgery, the plaintiff had no radicular pain, that is, pain radiating from his back into his legs.  Moreover, the plaintiff presented the testimony of Dr. Skaletsky to establish that it was a deviation from the standard of care for Dr. Elias, as the potential operating surgeon, to perform and interpret the discogram, which would determine whether spinal surgery was necessary.

The defendants then argue that testimony concerning Dr. Elias's financial incentive was improperly injected into the trial during Dr. Yeung's testimony.  On cross-examination, Dr. Yeung was asked whether criticism existed in the medical community regarding operating surgeons interpreting discograms for potential surgical patients, specifically operating surgeons who had a financial interest in the outcome of the discogram. Dr. Yeung acknowledged that such criticism existed.  Dr. Yeung acknowledged hearing physicians at medical seminars, including Dr. Alexander Ghanayem of Loyola University Medical Center, express their opinion that spinal surgeons should not perform and interpret discograms for their potential surgical patients.

**15**

The plaintiff based his negligence claim that Dr. Elias deviated from the standard of care in performing the IDET and endoscopic procedures on Dr. Elias's performance and interpretation of the discogram, the diagnostic tool for determining whether the subsequent procedures were necessary. The plaintiff argued that based on his symptoms, specifically his lack of radicular pain, the discogram could not indicate that the subsequent surgical procedures would relieve his pain. The evidence of financial incentive supported the plaintiff's claim that the surgical procedures were unnecessary. To refute the plaintiff's allegations, the defendants argued the discogram conclusively indicated the procedures were necessary, relying primarily on Dr. Yeung's testimony. In order to allow the jury to adequately assess the parties' varying theories of what occurred, the court allowed the financial incentive evidence.

We conclude that the trial court did not abuse its discretion in permitting the evidence of financial motive to be introduced in a limited and specific manner to address the issue of the defendants' compliance with the standard of care.

B. <u>Motion for New Trial</u>

1. Standard of Review

We review a trial court's denial of a motion for new trial based on the manifest weight of the evidence for an abuse of discretion.

**16**

## 2. Discussion

The defendants argue the verdict must be reversed because it is against the manifest weight of the evidence. The defendants contend the insufficiency of the evidence required the trial court to grant their posttrial motion for a new trial.

A trial court should order a new trial if, after weighing the evidence, the court determines that the verdict is contrary to the manifest weight of the evidence. Maple v. Gustafson, 151 Ill. 2d 445, 454, 603 N.E.2d 508 (1992). "'A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary and not based upon any of the evidence.'" Maple, 151 Ill. 2d at 454, quoting Villa v. Crown Cork & Seal Co., 202 Ill. App. 3d 1082, 1089, 560 N.E.2d 969 (1990). As a reviewing court, we will not reverse the trial court's decision with respect to a motion for a new trial unless the court abused its discretion. Maple, 151 Ill. 2d at 455.

The defendants argue the jury's liability finding must be overturned because the plaintiff failed to prove the standard of care and proximate cause regarding Dr. Elias's performance of the endoscopic discectomy and IDET procedure. What the defendants fail to recognize is that plaintiff was not claiming that Dr. Elias negligently performed the endoscopic discectomy and IDET procedure. Rather, the performance of these procedures was in and of itself negligent. Based on the plaintiff's symptoms and

**17**

the discogram, which the plaintiff maintained could not have possibly indicated surgery was necessary, the plaintiff's theory was that Dr. Elias breached the standard of care by performing unnecessary surgical procedures. Regardless of whether those procedures were properly performed, those unnecessary surgeries resulted in injury to him in the form of radicular pain.

The defendants maintain that the IDET procedure was indicated by the discogram. Therefore, Dr. Elias did not violate the standard of care by performing the IDET procedure because it was necessary. The defendants rely on the testimony of the plaintiff's orthopedic expert, Dr. Fossier, that "the IDET procedure, at least theoretically, may have had a place," and possibly "had a theoretical basis to help." The defendants claim because Dr. Fossier did not find use of the IDET procedure to be a deviation from the standard of care, nor did he establish any causal link between the IDET and the plaintiff's claimed injury, the plaintiff failed to establish his claim of medical negligence.

The plaintiff's other expert, Dr. Skaletsky, testified the IDET could not be indicated by the discogram and, therefore, found its use constituted a deviation from the standard of care. Dr. Skaletsky attributed the overall instability of the plaintiff's lumbar spine and the creation of right radiculopathy, in part, to Dr. Elias's performance of the IDET procedure on the plaintiff.

**18**

The defendants argue the expert testimony proves that differing opinions regarding the treatment options available to the plaintiff exist within the standard of care and, therefore, Dr. Elias's choice of treatment could not be considered a deviation of the standard of care merely because Dr. Skaletsky disagreed with it.  See Schmitz, 368 Ill. App. 3d at 455.

As we discussed above, the defendants' argument misconstrues the plaintiff's negligence claim.  Whether Dr. Elias breached the standard of care in performing the IDET procedure was not at issue.  Rather, the issue was whether Dr. Elias's breach of the standard of care in performing the discogram led to unnecessary surgical procedures, an injury in and of itself, and the plaintiff's radicular pain, which he claimed he did not experience prior to the procedures.  Accordingly, any differences between Dr. Fossier's and Dr. Skaletsky's opinions did not create for the jury "the impossible task of choosing between conflicting standards"; rather, they merely created a question of fact as to whether the plaintiff's claimed injury of radicular pain was the result of the IDET procedure, an issue properly resolved by the jury.

The jury's role is to resolve conflicts in the evidence, determine the credibility of the witnesses and decide the weight to be given each witness's testimony.  Maple, 151 Ill. 2d at 452. As a reviewing court, it is not within our power to "usurp the function of the jury and substitute [our] judgment on questions

**19**

of fact fairly submitted, tried, and determined from the evidence which did not greatly preponderate either way." Maple, 151 Ill. 2d at 452-53.

The credibility determination of the witnesses was for the jury to make and although each of the plaintiff's witnesses offered a different conclusion regarding whether the IDET procedure caused the plaintiff's radicular pain, we do not find the jury's implied acceptance of Dr. Skaletsky's opinion, based on its verdict in favor of the plaintiff, to be "'unreasonable, arbitrary and not based upon any of the evidence.'" Maple, 151 Ill. 2d at 454, quoting Villa, 202 Ill. App. 3d at 1089.

Next, the defendants argue the plaintiff failed to establish that Dr. Elias's performance of the surgical procedures proximately caused the plaintiff injury. The defendants claim that because the known risks of lumbar spinal surgery, performed within the standard of care, include a result of no improvement in the patient's symptoms, spinal instability, and/or injury to the nerve root or spinal cord, the plaintiff cannot establish a causal link.

The term "proximate cause" encompasses two distinct requirements: cause in fact and legal cause. Lee v. Chicago Transit Authority, 152 Ill. 2d 432, 455, 605 N.E.2d 493 (1992). The first requirement, cause in fact, is present "when there is a reasonable certainty that a defendant's acts caused the injury or damage." Lee, 152 Ill. 2d at 455. Legal cause is a question of

**20**

foreseeability. "'[A] negligent act is a proximate cause of an injury if the injury is of a type which a reasonable man would see as a likely result of his conduct.'" Lee, 152 Ill. 2d at 456, quoting Masotti v. Console, 195 Ill. App. 3d 838, 845, 552 N.E.2d 1292 (1990). The foreseeability of radicular pain from spinal surgery is not contested here.

The plaintiff argues that under a "cause in fact" analysis, he carried his burden of proof as to proximate cause by establishing that Dr. Elias performed an unnecessary procedure which caused an injury, regardless of whether that injury was a known risk of the surgery. Moreover, the plaintiff argues he established a clear connection between the defendants' breach of the standard of care and his injury through the expert testimony of Dr. Skaletsky. Dr. Skaletsky testified that the surgical procedures "resulted in significant narrowing of the central spinal canal as well as the lateral neuroforamina as well as instability and slippage of vertebra." Dr. Skaletsky concluded the disc volume in two discs decreased as a result of the surgical procedures and that the loss in disc volume caused the plaintiff's pain and numbness in his right leg. We agree that the plaintiff offered sufficient evidence from which the jury could reasonably find the element of proximate cause had been satisfied.

The defendants then argue the plaintiff failed to offer proof of injury. At trial, the plaintiff testified that after

**21**

the surgery, he could not exercise, run, or sit in a vehicle for an extended period of time. He claimed he was unable to work as a carpenter. The defendants contend the plaintiff's testimony did not support a finding that the procedures caused injury. The defendants maintain that as of the trial in September 2007, the plaintiff had been working, postoperatively, for 4 1/2 years as a union organizer for the Chicago Regional Carpenters. Additionally, prior to surgery, the plaintiff took prescription pain medicine; at trial, he testified he was using over-the-counter pain medication. Prior to surgery, the plaintiff was unable to lift, walk, run or sit for any length of time. The defendants argue the physical limitations the plaintiff experienced after the surgery are the same he experienced prior and, therefore, the plaintiff did not establish an injury causally linked to Dr. Elias's conduct.

The plaintiff maintains that Dr. Elias's performance of the unnecessary surgical procedures caused injury to the plaintiff in the form of radicular pain into his right leg, which was not present before the procedures. The defendants argue that the plaintiff had radicular pain into his right leg prior to undergoing the surgical procedures. However, the plaintiff denied experiencing radicular pain at any time prior to the procedures. Dr. Yeung, the defendants' expert witness, conceded that the radicular pain experienced by the plaintiff following the surgery was caused or contributed to by the surgical

**22**

procedures.

Based on the evidence presented concerning the plaintiff's injuries following the surgical procedures, at best the defendants raised a factual dispute. As such, this issue was properly decided by the trier of fact. Maple, 151 Ill. 2d at 452. Because we will not substitute our judgment for that of the trier of fact on issues of credibility and the weight to be given any particular piece of evidence, we accept the jury's implied conclusion, based on their verdict against the defendants, that the plaintiff offered sufficient evidence to show injury.

At trial, the jury resolved the matters the defendants raise on appeal in favor of the plaintiff. The jury's conclusion was not arbitrary or unreasonable in light of the evidence before it. Accordingly, the trial court properly determined that a new trial was not justified because the jury's conclusion was not against the manifest weight of the evidence. The trial court did not abuse its discretion in denying the defendants' motion for a new trial.

### C. Plaintiff's Cross-Appeal

In his cross-appeal, the plaintiff contends that the trial court abused its discretion in granting remittitur of his future medical expenses.

The jury returned a verdict in favor of the plaintiff in the amount of $500,000, which included an award for future medical expenses in the amount of $155,000. The defendants filed a

posttrial motion arguing, <u>inter alia</u>, that the award of future medical expenses was not supported by the evidence at trial. The trial court granted in part and denied in part the portion of the defendants' posttrial motion seeking remittitur, agreeing that some of the future medical expenses were not adequately supported by the evidence. In reducing the plaintiff's award by $100,000, the trial court recognized that an expert is not required to provide specific amounts to support an award of future medical expenses. However, the court stated:

> "The problem that I am having is you have to have some evidence so the jury doesn't speculate or use their own personal knowledge which they're not supposed to do. There must be something in the record from which a jury has a basis to give future medical numbers."

The plaintiff consented to the entry of the remittitur to avoid a new trial on the issue of damages.

Supreme Court Rule 366(b)(2)(ii) permits a party to raise the issue of the remittitur on appeal only if the opposing party brings an appeal from the judgment. 155 Ill. 2d R. 366(b)(2)(ii). Here, the defendants initiated the appeal and, therefore, the issue of remittitur is properly before us.

### 1. Standard of Review

We review the trial court's ruling on a motion for a remittitur for an abuse of discretion. See <u>Kindernay v. Hillsboro Area Hospital</u>, 366 Ill. App. 3d 559, 572, 851 N.E.2d

No. 1-08-0265

866 (2006).

2. Discussion

The damages at issue concern the cost of a future spinal fusion surgery. In his deposition testimony, Dr. Gutierrez opined that the plaintiff would need to undergo a lumbar fusion in order to stabilize his spine and that the cost for such a procedure would be $55,000. Dr. Gutierrez further stated that in addition to the surgical fee, the plaintiff would incur expenses for a one week stay in the hospital following the spine fusion, as well as charges for radiology, anesthesiology and physical therapy services. The plaintiff argues Dr. Gutierrez's testimony was sufficient to support the jury's award of $100,000 for future medical expenses not specifically itemized.

In Richardson v. Chapman, 175 Ill. 2d 98, 676 N.E.2d 621 (1997), our supreme court observed that, "[t]he determination of damages is a question reserved to the trier of fact, and a reviewing court will not lightly substitute its opinion for the judgment rendered in the trial court." Richardson, 175 Ill. 2d at 113. "A verdict will not be set aside by a court unless it is so excessive that it indicates that the jury was moved by passion or prejudice or unless it exceeds the necessarily flexible limits of fair and reasonable compensation or is so large that it shocks the judicial conscience." Kindernay, 366 Ill. App. 3d at 572. Where the jury's award falls within the flexible range of conclusions reasonably supported by the evidence, the court

**25**

should not grant a remittitur.  Kindernay, 366 Ill. App. 3d at 572.

The defendants cite Kinzinger v. Tull, 329 Ill. App. 3d 1119, 770 N.E.2d 246 (2002).  In Kinzinger, the Fourth District reduced a jury's award of future medical expenses because it was "over three times the amount established in the trial court and not supported by the evidence."  Kinzinger v. Tull, 329 Ill. App. 3d at 1130.  Specific amounts of past and future medical expenses were introduced into evidence.  Based on the evidence presented at trial, the appellate court found the jury had no basis to award an amount greater than the specific amounts introduced into evidence.  Kinzinger, 329 Ill. App. 3d at 1130.  Nonetheless, the court in Kinzinger recognized that "the jury enjoys a certain degree of latitude in awarding compensation for medical costs that, as shown by the evidence, are likely to arise in the future but are not specifically itemized in the evidence."  Kinzinger, 329 Ill. App. 3d at 1130, citing Richardson, 175 Ill. 2d at 112.

In Richardson, the supreme court reduced a $1.5 million jury award for future medical expenses by $1 million.  The court concluded that the adjustment allowed the plaintiff recovery for expected expenses for which no specific estimates were introduced, but was not so large as to be excessive in light of the trial testimony.  Richardson, 175 Ill. 2d at 112-13.

In light of Richardson, we find the trial court abused its discretion by reducing the jury's award by $100,000 for future

No. 1-08-0265

medical expenses not specifically itemized. Dr. Gutierrez's deposition testimony supported an award of future medical expenses over the $55,000 attributed to the surgical fee. Dr. Gutierrez opined the plaintiff would incur expenses for a one-week stay in the hospital following the surgery, as well as charges for radiology, anesthesiology and physical therapy services. We find nothing to suggest the jury's award of $100,000 to cover these additional charges resulted from passion or prejudice, or that it exceeded the necessarily flexible limits of fair and reasonable compensation. See Kindernay, 366 Ill. App. 3d at 572. Accordingly, it was an abuse of discretion for the trial court to subject the jury's award to remittitur for $100,000.

### III. CONCLUSION

The jury's verdict as to liability is affirmed, and the cause is remanded. The trial court is directed to vacate the remittitur in the amount of $100,000 and enter judgment in favor of the plaintiff in the amount awarded by the jury.

Affirmed in part; cause remanded with directions.

PATTI, J., concurs.

GARCIA, J., dissents.

JUSTICE GARCIA, dissenting:

I am persuaded by Dr. Elias's argument that the circuit court deviated from the Illinois Supreme Court's holding in Neade v. Portes, 193 Ill. 2d 433, 739 N.E.2d 496 (2000), by admitting

**27**

evidence, according to the plaintiff's own brief, that Dr. Elias had "a financial incentive for him to interpret the results of the discogram as an indication for the subsequent spinal surgery to be performed by him." (Emphasis added.) More fundamentally, I question the legitimacy of the plaintiff's theory that Dr. Elias violated the standard of care for an orthopedic surgeon by "personally performing the discogram on Mr. Martinez" when Dr. Elias also performed the endoscopic discectomy and the IDET procedure, both of which he determined were medically warranted based on the results of the discogram. I fault the plaintiff's theory because no case is presented that permits the performance of a medical procedure to be characterized as violating the applicable standard of care without faulting the performance of the medical professional in carrying out the medical procedure itself. The plaintiff deems it malpractice whenever an orthopedic surgeon performs a discogram on a patient when the same surgeon may perform additional surgery, as the diagnostic results of the discogram dictate, without regard to whether the discogram itself was properly performed. The plaintiff's theory suggests that an orthopedic surgeon has a duty not to perform both the discogram and any subsequent spinal surgery because there is a financial incentive for the orthopedic surgeon to interpret the results of the discogram in favor of subsequent spinal surgery. I believe such a theory is the equivalent of a fiduciary duty claim in the context of a medical malpractice

**28**

suit, which our supreme court disavowed. Neade, 193 Ill. 2d at 450 ("We decline to recognize a new cause of action for breach of fiduciary duty against a physician for the physician's failure to disclose [financial] incentives ***").

### Medical Negligence

"To sustain an action for medical negligence, plaintiff must show: (1) the standard of care in the medical community by which the physician's treatment was measured; (2) that the physician deviated from the standard of care; and (3) that a resulting injury was proximately caused by the deviation from the standard of care." Purtill v. Hess, 111 Ill. 2d 229, 241-42, 489 N.E.2d 867 (1986). I believe the evidence falls short in this case on the key elements of the standard of care and proximate cause.

Even accepting the plaintiff's theory that the endoscopic discectomy and the IDET were medically unnecessary and that the performance of each injured the plaintiff, that Dr. Elias performed the discogram, rather than another physician, says little about whether the endoscopic discectomy or the IDET should have been performed where the plaintiff's evidence was that there is a high incidence of false positives with the discogram. Stated differently, given the high incidence of false positives in the discogram procedure, proximate cause between Dr. Elias's performance of the discogram and the injury the plaintiff allegedly suffered by the performance of the endoscopic discectomy and the IDET is at best tenuous.

**29**

Even if an independent orthopedic surgeon had performed the discogram, based on the purported high incidence of false positives, that medical professional might well have determined that the endoscopic discectomy and the IDET were medically warranted. If the endoscopic discectomy and the IDET were determined to be medically warranted based on the results of an independently performed discogram, it necessarily follows that there is no nexus between Dr. Elias performing the discogram and his performance of the endoscopic discectomy and the IDET on the plaintiff, which he found medically warranted based on the results of the discogram. See Aguilera v. Mt. Sinai Hospital Medical Center, 293 Ill. App. 3d 967, 976, 691 N.E.2d 1 (1997) (no medical link between the alleged negligence in the delay in performing a CT scan and any neurosurgery, which might have been indicated, when the damage to the decedent's brain was beyond surgical help); Scardina v. Nam, 333 Ill. App. 3d 260, 271, 775 N.E.2d 16 (2002) (alleged failure to properly read the radiological film did not impact surgeon's examination of the plaintiff's colon during the subsequent surgery).

Apart from proximate cause, I also question the standard of care evidence. The standard of care is the relevant inquiry by which we judge a physician's actions in a medical negligence case. Under a standard of care analysis, a defendant will be held to "the reasonable skill which a physician in good standing in the community would use in a similar case." Newell v. Corres,

125 Ill. App. 3d 1087, 1094, 466 N.E.2d 1085 (1984). Only if a physician deviates from the standard of care, by demonstrating less than reasonable skill, can the physician be held liable for medical negligence.

Here, the jury was instructed that as to this claim by the plaintiff, Dr. Elias was negligent in that he "relied on a discogram that he personally performed." Yet, the skill of Dr. Elias in performing the discogram was never questioned. No medical expert testified that Dr. Elias performed the discogram with less than "the reasonable skill which a physician in good standing in the community would use in a similar case." Instead, Dr. Elias was faulted for performing the discogram "personally." This, I submit, was at best a "judgment" call on the part of Dr. Elias, with which the plaintiff's experts disagreed.[2]

I cannot agree that the standard of care in this case directs that a "treating physician and a potentially operating surgeon [cannot] be the same person performing the discogram in a patient" as Dr. Skaletsky testified. Whether the "treating

---

[2] Even the language used by Dr. Skaletsky to describe the controversy within the medical community over the diagnostic role of discograms suggests it is a matter of judgment. The discogram is controversial "[b]ecause the reliance upon a purely subjective response is considered by many inappropriate in its usage to direct a potential surgical procedure ***." Emphasis added.

physician and a potentially operating surgeon" are the same person says absolutely nothing about "the reasonable skill which a physician in good standing in the community would use in a similar case." Newell, 125 Ill. App. 3d at 1094. The reason for my categorical statement is evident: Had Dr. Skaletsky himself performed the discogram on Mr. Martinez, the diagnostic result of the discogram may very well have been the same as the result Dr. Elias reached. While we do not know, I submit, the record evidence was insufficient to allow the jury to conclude that the standard of care required someone other than Dr. Elias perform the discogram when it cannot be denied that the same result might have been obtained had the discogram been performed by another physician. The plaintiff's experts' opinions to the contrary amounted to no more than their own personal preference for having an independent orthopedic surgeon perform the discogram.

> "It is insufficient for plaintiff *** merely
> to present testimony of another physician
> that he would have acted differently from the
> defendant, since medicine is not an exact
> science. It is rather a profession which
> involves the exercise of professional
> judgment within the framework of established
> procedures. Differences in opinion are
> consistent with the exercise of due care."
> Walski v. Tiesenga, 72 Ill. 2d 249, 259, 381

**32**

N.E.2d 279 (1978).

I submit the evidence regarding the standard of care is lacking where the plaintiff's claim amounts to no more than Dr. Elias "personally performed" the discogram.  I cannot agree that this medical malpractice theory put forth by the plaintiff was a legitimate means of calling into question Dr. Elias's medical skills.

Because I find that the plaintiff's theory of malpractice as to Dr. Elias' performance of the discogram amounts to no more than a fiduciary duty claim, the presentation of this claim to the jury is reversible error.  Neade, 193 Ill. 2d at 450 ("We decline to recognize a new cause of action for breach of fiduciary duty against a physician for the physician's failure to disclose [financial] incentives ***").  I reject the plaintiff's claim that on the record evidence before us, the standard of care required someone other than Dr. Elias perform the discogram.  I find the evidence of the proximate cause element of this claim that Dr. Elias committed malpractice lacking.  The plaintiff can make no showing of any injury proximately resulting from Dr. Elias's performance of the discogram because the plaintiff is unable to demonstrate that the discogram result would have differed had Dr. Skaletsky or some other orthopedic surgeon performed the discogram instead.

Evidence of Financial Incentive

In his brief, the plaintiff seeks to support the

**33**

introduction of "financial interest" evidence because "the introduction of this evidence was limited and specific to the issue of the defendants' compliance with the standard of care." The plaintiff claims, "the evidence of financial incentive goes to the heart of the breach of the standard of care by the physician." I note no authority is cited for the introduction of such evidence even where its purpose is "limited and specific."

The plaintiff seeks to distinguish the decision in <u>Bearden v. Hamby</u>, 240 Ill. App. 3d 779, 608 N.E.2d 282 (1992), with his claim that the plaintiff in <u>Bearden</u> sought the defendant doctor's tax returns "to establish the reason <u>why</u> the defendant physician breached the standard of care" (emphasis in brief), claiming the financial incentive evidence in his case goes to "how" the defendant breached the standard of care. I fail to see the distinction between "how" and "why" evidence as to a claimed breach of the standard of care; nor am I persuaded that the jury would understand the difference. I submit the distinction between how and why is illusory in the absence of any authority that establishes such "legal" concepts in Illinois jurisprudence. In any event, our supreme court has made clear that only one reason is available to introduce financial incentive evidence--to demonstrate possible bias on the part of the physician, which is possible only during cross-examination of the physician. <u>Neade</u>, 193 Ill. 2d at 450 ("capitation fund" evidence relevant only for impeachment purposes).

**34**

In an effort to place the financial incentive evidence within the Neade ruling that such evidence may be admissible to demonstrate bias, the plaintiff claims his contention was "that the testimony of Dr. Elias that his performance and interpretation of the discogram supported his recommendation for surgery goes to his interest and bias for performing and interpreting the discogram in that manner. The testimony of plaintiff's experts was that Dr. Elias deviated from the standard of care by performing and interpreting the discogram precisely because he had a financial interest in performing the ultimate surgery." In Neade, the "financial incentive arrangement" was offered as an explanation for the defendant doctor's decision not to order a second opinion. Neade, 193 Ill. 2d at 444. The allegation was that the defendant doctor failed to order the second opinion because the defendant doctor would pocket funds not used to cover such referrals and, thus, had a financial incentive to put his own interest above the patient's. Unlike in Neade, I see no connection between Dr. Elias personally performing the discogram and the suggestion that the results of the discogram might be influenced because Dr. Elias would be paid for performing any additional surgery. I submit the concept that a doctor is remunerated for medical procedures conducted is grossly distorted when the remuneration itself is introduced as evidence of a "potential appearance of a vested interest from a surgical as well as financial outcome of the operating surgeon

**35**

being the same one to perform the study" as Dr. Skaletsky testified to support the plaintiff's claim of an alleged breach of the standard of care.

In other words, I reject the plaintiff's implied claim that the financial incentive evidence, which the supreme court held may be admitted to demonstrate bias in Neade, is equivalent to the astonishingly obvious concept that Dr. Elias would be paid for the performance of the endoscopic discectomy and the IDET procedures. In Neade, the plaintiff alleged that the defendant doctor was improperly influenced by the contract he had with the HMO that gave the doctor an incentive to reject outside test referrals where the doctor would receive 60% of any of the allocated funds not expended for such outside test referrals. Neade, 193 Ill. 2d at 437-38. That is a far cry from the plaintiff's claim here that Dr. Elias personally performing the discogram gave rise to a financial incentive because Dr. Elias would be paid for any subsequent surgeries if he determined that the endoscopic discectomy and the IDET procedures were medically warranted based on the results of the discogram.

The plaintiff's claim that the "plaintiff's experts' opinions could not logically have been presented to the jury without an explanation as to the reason that interpretation of the discogram by the operating surgeon falls below the standard of care" simply seeks to prove too much. Whether the explanation gave logic to the experts' opinions, I submit the opinions that

**36**

Dr. Elias should not have personally performed the discogram should not have been admitted at all. The experts' opinions amounted to no more than "personal preferences" for having an independent orthopedic surgeon perform the discogram. See Walski, 72 Ill. 2d at 259, 381 N.E.2d 279 (1978) ("It is insufficient for plaintiff *** merely to present testimony of another physician that he would have acted differently from the defendant, since medicine is not an exact science").

The circuit court's admission of the plaintiff's evidence that Dr. Elias personally performed the discogram and then was remunerated for the endoscopic discectomy and the IDET procedure that he determined were medically warranted by the results of the discogram, under the guise of a deviation of the standard of care as presenting some sort of improper financial motivation, was reversible error under Neade. I would remand for a new trial.

I dissent.